UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ELLIS WALKER,

                          Plaintiff,

        -against-                                      9:11-CV-0287 (LEK/DJS)

DEBORAH G. SCHULT, *et al.*,

                          Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

On March 11, 2011, Plaintiff brought this action pro se, claiming that his cell conditions

at Ray Brook Correctional Facility ("FCI Ray Brook") amounted to constitutional violations of

his Eighth Amendment rights. Dkt. No. 1 ("Complaint"). Defendants made a Partial Motion for

Summary Judgment on June 11, 2014, seeking to dismiss the Complaint for failure to exhaust

administrative remedies except for three limited issues. Dkt. No. 67. U.S. Magistrate Judge

Randolph F. Treece issued a Report-Recommendation on October 15, 2014, that recommended

denying Defendants' Motion. Dkt. No. 72. On December 11, 2014, this Court approved and

adopted Judge Treece's Report and Recommendation in its entirety, denying Defendants'

Motion. Dkt. No. 77. On November 30, 2015, Defendants once again moved for Summary

Judgment. Dkt. No. 105. For the following reasons, the Court denies Defendants' Motion.

## II.    BACKGROUND

### A. Material Facts

#### 1. Mohawk B and Cell 127

Plaintiff's claims arise from his experience during his incarceration in Cell 127 at FCI Ray Brook. Dkt. No. 105-2 ("Defendants' Statement of Material Facts") ¶ 1. Plaintiff was held in Cell 127 from November 2008 through April 2011, during which time approximately sixty inmates were assigned to the cell. Id. ¶¶ 1, 7. His cell housed a total of six inmates and had three sets of bunk beds, six chairs, two sinks, two toilets, six lockers, and a single writing surface. Id. ¶¶ 2–3. Cell 127 was located in the Mohawk B Unit, which had approximately 3522 square feet of unencumbered common space. Id. ¶ 4.

Plaintiff disputes Defendants' claim that the chairs assigned to inmates in each cell could be removed and used in the common areas or stacked for compact storage in the cell. Id. ¶ 3. Plaintiff disputes this on the basis that stacking the chairs would require the cooperation of other inmates, and that chairs and lockers were already being used as makeshift ladders for the bunk beds. Id. According to Plaintiff, "there is neither evidence that the inmates were allowed to leave the chairs outside the cells on a prolonged basis, nor that the chairs could be or in fact ever were stacked while in the cell." Dkt. No. 111-27 ("SMF Response") ¶ 3.

Plaintiff and Defendants also disagree about the square footage of the cell. According to Plaintiff, Cell 127 had approximately 173.91 square feet of space, approximately 92 feet of which was unencumbered. SMF Resp. ¶¶ 5–6. Defendants measure Cell 127 as having approximately 178.33 square feet overall, and approximately 118.5 square feet of unencumbered space. Defs.' SMF ¶¶ 5–6. Finally, Defendants allege that the inmates at FCI Ray Brook could

leave their cells for activities including "recreation, work, chapel, meals, educational programs, the library, medical appointments and [to] see visitors." Id. ¶ 8. Plaintiff disputes this, noting that the activities were "only available to specific individuals at designated times." SMF Resp. ¶ 8.

Plaintiff additionally states that FCI Ray Brook is a medium-security prison for males. Dkt. No. 111-27 ("Plaintiff's Statement of Material Facts") ¶ 1. Used as a six-person cell throughout Plaintiff's imprisonment there, Cell 127 was originally two separate two-man cells until the adjoining wall was knocked down. Id. ¶¶ 5–6. Plaintiff also claimed that inmates hung clothing from their bunks, further encumbering the space. Id. ¶ 37. Finally, Plaintiff contends that "FCI Ray Brook's overcrowded conditions are unacceptable under contemporary medical and mental health standards." Id. ¶ 38.

### 2. Cell Temperature and Ventilation

Defendants cite the 2006 American Correctional Association ("ACA") Accreditation Report, explaining that every housing unit at FCI Ray Brook had "air handler" units to provide heated fresh air in winter as well as exhaust fans. Defs.' SMF ¶ 9. The cell doors had food slots, or "wickets," that could be opened for increased air circulation. Id. ¶¶ 12. The cell's two windows were another source of airflow; Plaintiff and his cellmates would open them to dry the floors after cleaning, though opening the windows on a daily basis in winter made the cell colder. Id. ¶¶ 11, 14–16. Plaintiff would open the windows for his fellow inmates when they were cleaning and did not recall asking them to close them in winter. Id. ¶¶ 17–18. Plaintiff adds that the windows were sometimes difficult to open in the winter due to ice forming on the frame, freezing them shut. SMF Resp. ¶¶ 14–15, 18–19. Plaintiff never reported temperature or ventilation problems in Cell 127 to medical staff. Defs.' SMF ¶ 20.

Plaintiff disputes Defendants' claim that airflow surveys showed air circulation in Mohawk B to be "within required parameters" according to 2009 and 2012 ventilation testing. Defs.' SMF ¶ 10. Plaintiff contests this because these surveys occurred only twice and at predetermined times of which the institution was aware. SMF Resp. ¶ 10. Plaintiff considers this to be a misleading representation because institutional staff would "routinely do house-cleaning to make sure that all of the required standards were met on the day of the audit," therefore showing that these audits failed to provide real evidence of air circulation within the required parameters. Id.

Plaintiff agrees, as noted, with Defendants' description of the wicket in the cell door that could be opened in summer for increased airflow; however, Plaintiff asserts that this was only used as a "desperate measure" because of extreme heat, based on the testimony of Defendant Salamy. SMF Resp. ¶ 13. As for other sources of airflows, Plaintiff disputes that the windows could be opened because in winter they were often frozen shut. Id. ¶ 11.

Finally, Plaintiff disagrees with Defendants' assertion that the temperature and ventilation in Cell 127 never caused Plaintiff "any specific health problems." Defs.' SMF ¶ 21. Plaintiff claims that the winter and summer temperatures were "deleterious to his health." SMF Resp. 21.

Plaintiff also asserts that, during his time housed in Cell 127, outdoor temperatures in Ray Brook were as low as -36 degrees Fahrenheit. Pl.'s SMF ¶ 52. Further, while Plaintiff admits that he did not complain to medical staff about issues with temperature and ventilation, he did bring complaints to their superiors, such as the warden. Id. ¶ 53. Plaintiff states that he was not the only inmate to complain about ventilation problems in cells at FCI Ray Brook. Id. ¶ 54.

### 3. Bunk Beds

Plaintiff was assigned to one of the upper bunks in Cell 127 for some of his time there. Defs.' SMF ¶ 22. The bunks did not have attached ladders, and inmates could request lower bunks. Id. ¶¶ 23–24. Plaintiff adds that there were no ladders at all, and requests for bunks were not necessarily honored since moving bunks required a free space in a lower bunk. SMF Resp. ¶¶ 23–24. Plaintiff's bunk was less than 32 inches in width. Id. ¶ 27; Defs.' SMF ¶ 27. Plaintiff never complained about the width of his bed to FCI Ray Brook medical staff. Defs.' SMF ¶ 28.

Defendants claim that Plaintiff never requested a lower bunk; Plaintiff does not recall whether or not he formally requested a lower bunk and considers his request implicit, based on his filing of formal grievances about the absence of ladders. SMF Resp. ¶ 25; Defs.' SMF ¶ 25. Plaintiff also disputes Defendants' claim that the lack of ladders did not cause any "specific hardship." SMF Resp. ¶ 26. According to Plaintiff, the need to stack chairs and lockers to access the top bunk, as well as possibly stepping on others' belongings, heightened the risk of violence between Plaintiff and his cellmates. Id. Plaintiff also states that he once fell and injured himself climbing into the top bunk. Id. Plaintiff and Defendants dispute the width of the bunks; Defendants state that all bunks at FCI Ray Brook measure twenty-eight inches, while Plaintiff's counsel measured the bunk at twenty-seven inches. Defs.' SMF ¶ 27; SMF Resp. ¶ 27. Finally, Defendants state that Plaintiff "suffered no specific injury" due to the bunk's narrowness. Defs.' SMF ¶ 29. Plaintiff disputes this, claiming that the bunk was too small and narrow, which made it difficult to get comfortable. SMF Resp. ¶ 29.

*4. Cell Sanitation*

Plaintiff and other inmates were responsible for cleaning their cells. Defs.' SMF ¶ 30. Mops, buckets, brooms, and toilet brushes were stored in an unlocked closet in Mohawk B which inmates could access. Id. ¶ 32. Cell inspections were conducted daily by unit staff and weekly by executive staff. Id. ¶¶ 37–38. Correctional counselor Jackii Sepanek and a unit officer inspected the Mohawk B cells (where Plaintiff's cell was located) during the week. Id. ¶ 39. Plaintiff's cell had two sinks and two toilets, and other facilities in FCI Ray Brook were available for inmates' use throughout the day. Id. ¶¶ 40–41. Plaintiff stated that his cellmates told him that urine and feces would "splatter" on the floor when the toilets were used, though Plaintiff never saw the splatter occur. Id. ¶¶ 42, 44. Plaintiff adds, however, that he did see the urine and feces on the toilet. SMF Resp. ¶ 42. Plaintiff's cellmates told him not to use one of the toilets because the sink for washing dishes would be splattered. Defs.' SMF ¶ 43.

Plaintiff disputes many of Defendants' statements about the availability of cleaning supplies to inmates. Though Plaintiff admits that he never reported to staff that supplies were being sold by unit orderlies, he does claim that the cleaning supplies were often not available to inmates; inmates had no cleaning supplies for periods as long as a month. Defs.' SMF ¶¶ 31, 33–35, 46. These cleaning supplies, which FCI Ray Brook provided, include scouring powder and pads, brooms, dust pans, toilet brushes, glass cleaner, general purpose cleaner, and antibacterial cleaner. Id. ¶¶ 31, 33. Defendants state that the inmates could obtain concentrated cleaning chemicals by leaving their identification badge at the unit office in exchange for spray bottles, but Plaintiff disputes their availability. Id. ¶¶ 34–35; SMF Resp. ¶¶ 34–35. According to Defendants, chemical cleaners were delivered once a week to the housing units, and units could

contact the safety department for more chemicals. Defs.' SMF ¶ 36. Plaintiff counters that it usually was on a per month basis, and inmates sometimes "filed grievances specifically because the housing units ran out of the cleaning supplies and could not obtain more until the next scheduled delivery." SMF Resp. ¶ 36. Defendants claim that Plaintiff never reported such concerns to staff; Plaintiff argues that he included grievances about cell sanitation when he filed his BP-10 grievance form, in which he mentioned that the cells stay "dirty," and never verbally reported to staff for fear of retaliation by his fellow inmates. Defs.' SMF ¶ 45; SMF Resp. ¶ 45, Dkt. No. 1-1 ("Administrative Grievances") at 5.                                    .

Finally, Plaintiff disputes Defendants' assertion that "from March 2008 though March 2009, a total of two inmate grievances relating to safety or sanitation were filed" and "from February through December 2011, a total of four inmate grievances relating to safety or sanitation were filed." Defs.' SMF ¶¶ 47–48. Plaintiff disputes these statements on the grounds that they are based on self-reported data and Defendants did not provide copies of reports or investigation involving various conditions of the prison, claiming that the request was "outside the scope" of the allegations of the case. SMF Resp. ¶¶ 47–48. The subject of the requested reports and investigations included "placement or size of inmate beds, overcrowding, sanitation or ventilation problems, or excessive noise or light." Id. ¶ 47. Plaintiff contends that these statements are not appropriate to include in a statement of material facts because Defendants previously refused to produce discovery on this issue. Id. ¶¶ 47–48.

Plaintiff adds that the toilets in Cell 127 were located mere feet away from where the inmates slept and ate, and one was not used so that the sink near it could be used to wash dishes without the risk of urine splashing it. Pl.'s SMF ¶¶ 40–41. Plaintiff feared violence from his

fellow cellmates if he used that toilet. Id. ¶ 41. Plaintiff also states that defendant Sepanek, as a

counselor, issued cleaning supplies; however, she delegated this duty to inmate orderlies, who

"created a black market" for selling cleaning supplies to inmates. Id. ¶¶ 43, 45–46. Plaintiff did

not report this out of fear of violence for being a "snitch." Id. ¶ 47. Plaintiff states that each

housing unit had four to five toilet brushes per 125 inmates. Id. ¶ 48.

### 5. Fear of Violence

To prevent gangs from dominating housing units, FCI Ray Brook separates and

distributes members of different gangs throughout the units. Defs.' SMF ¶ 53. Certain gangs are

kept separate for security reasons. Id. ¶ 54. FCI Ray Brook also tries to "maintain a racial

balance" in the units. Id. ¶ 55.

Plaintiff disputes Defendants' reports of how many violent altercations between inmates

occurred from February 2008 through January 2009 and from February 2011 through January

2012. Defs.' SMF ¶¶ 49–52. According to Defendants, there were five inmate-inmate assaults

with a weapon and sixteen without during the 2008 year, and two inmate-inmate assaults with a

weapon and eleven without during the 2011 year. Id. Plaintiff alleges that these assessments are

based on self-reported data, and are therefore not reliable because other data self-reported by

Defendants (such as those about the ACA's unencumbered space requirements) were allegedly

unreliable. SMF Resp. ¶¶ 49–52. Further, Plaintiff contends that this information is incomplete

because it only includes reported instances of violence. Id.

Plaintiff also disagrees with Defendants' statements about Plaintiff's experiences in Cell

127. First, Defendants claim that Plaintiff "never raised safety concerns" about Cell 127 to any

staff member. Defs.' SMF ¶ 56. Plaintiff counters that he filed formal grievances that included

safety concerns, such as his fear for himself and others and his statement that "someone is going to get killed" unless the dangerous conditions were remedied. SMF Resp. ¶ 56. Defendants assert that Plaintiff testified that was involved in a single physical altercation in Cell 127; Plaintiff claims that he testified to one specific physical altercation (regarding a cellmate's failure to clean up), but there were other fights about which he could not recall specific details. Defs.' SMF ¶ 57; SMF Resp. ¶ 57. Plaintiff does not dispute Defendants' statement that Plaintiff did not report the fight, but adds that he did not report "certain occurrences" out of "fear of violent retribution." Defs.' SMF ¶ 58; SMF Resp. ¶ 58.

Plaintiff also disputes Defendants' statement that Plaintiff "did not request a cell reassignment until he had been in Cell 127 for two and a half years," waiting until April 2011, shortly before his request was approved. Defs.' SMF ¶¶ 59–61. According to Plaintiff, his repeated complaints about Cell 127 and desire to move were sufficient to make his concerns known, and the lack of formal requests is explained by the fact that prisoners could move into a two-man cell when inmates housed there invited them to live with them—thus making a request a "futile exercise." SMF Resp. ¶¶ 59–60. He moved in April 2011 because he was invited by another prisoner named Leonard Nimoy. Id. ¶ 61; Dkt. No. 105-3 ("Walker Deposition") at 68:12–22, 69:21–70:05.

Plaintiff states that defendant Sepanek was authorized "to reassign [Plaintiff] to a two-man or four-man cell at any time," and further claimed that Sepanek testified that she had reassigned inmates who complained of cell conditions in the past. Pl.'s SMF ¶¶ 94–95. Sepanek was responsible for tracking open beds but waited until Plaintiff was invited by another inmate before she reassigned him. Id. ¶ 96. Plaintiff describes in detail the physical altercation he had

with a cellmate after that cellmate would not clean up the toilet after dirtying it; Plaintiff claims that the gang member friends of his cellmates tried to stab Plaintiff in the head. Id. ¶¶ 98–99. Plaintiff has never been in a gang. Id. ¶ 102.

### 6. Sleep Deprivation

Plaintiff never reported sleep deprivation or related issues to medical staff or psychology staff. Defs.' SMF ¶¶ 62–63. While living in Cell 127, he attended yoga classes, participated in three educational programs, and researched and submitted legal briefing. Id. ¶¶ 64–66. While Defendants claim that Plaintiff completed the educational programs, Plaintiff notes that one was brief and another was cancelled midway through. SMF Resp. ¶ 65.

Defendants and Plaintiff disagree as to the facts pertaining to the noise levels in Mohawk B. Defendants report that noise levels were within ACA guidelines according to 2011 surveys and that the 2011 inspection by ACA auditors indicated quiet noise levels. Defs.' SMF ¶¶ 67–68. Plaintiff counters by asserting that the surveys only tested "potential high noise producing equipment" were confined to a specific time on only two specific dates. SMF Resp. ¶ 67. Plaintiff does not dispute the noise levels being described as "quiet" but considers the statement misleading as the date of the audit was predetermined, thus allowing the institution to know and prepare for it. Id. ¶ 68. It took place between 8:30 AM and 2:30 PM, while Plaintiff's complaints pertained to noise at night. Id.

Finally, Defendants claim that the Mohawk Unit televisions played without sound, and inmates listened with radio headsets. Defs.' SMF ¶ 69. Plaintiff reports that inmates had makeshift speakers, not headsets. SMF Resp. ¶ 69.

Plaintiff states that he is 6'4" and 255 pounds. Pl.'s SMF ¶ 59. Because the beds were too narrow, Plaintiff could not lie flat and had to "constantly rotate back and forth." Id. ¶ 61. Plaintiff states that televisions were left on during the night in common areas. Id. ¶ 97. Plaintiff also claims that he complained to the medical and psychiatric staffs' superiors, including the warden, about his sleep deprivation, but did not want to report it directly to medical staff because he did not want to be medicated. Id. ¶¶ 63–64.

### 7. Deliberate Indifference

It is undisputed that Plaintiff filed his initial administrative grievance on October 12, 2009, and appealed to the next level on October 30, 2009. Defs.' SMF ¶¶ 70–71. On March 16, 2011, Plaintiff filed his Complaint. Id. ¶ 77. Defendants claim that, prior to filing his first administrative grievance, Plaintiff did not report overcrowding in Cell 127. Id. ¶ 75. Plaintiff disputes this, stating that he had verbally complained about the overcrowded conditions and the effects of overcrowding "to all of the Defendants." SMF Resp. ¶ 75.

Defendants assert that fourteen of Plaintiff's allegations "were not contained in Plaintiff's administrative remedy forms, and [were] not brought to the attention of the individual defendants until Plaintiff filed his Complaint." Defs.' SMF ¶ 79. Plaintiff agrees that he did not include the following allegations: (1) that Defendants were intentionally causing trouble in cells by mixing different gangs and races, (2) that Plaintiff's bunk was twenty-eight inches wide and too narrow for comfortable sleep, and (3) that Defendants and the ACA "conspired" in Eighth Amendment violations since the ACA waived its standards to accredit FCI Ray Brook. SMF Resp. ¶ 79(A)–(B), (N). Plaintiff asserts, however, that he complained about the lack of ladders "at every stage of the grievance process," referencing the risk of violence and injury due to the lack

11

of ladders for the bunks. Id. ¶ 79(C). Plaintiff states that he notified the unit guard when he fell from his bunk when the incident occurred but never heard back. Id. ¶ 79(D). As for noise complaints, including claims regarding cellmates watching television, playing games, and other noise from overcrowding that caused difficulty in sleeping, Plaintiff claims that he complained of the "constant noise and commotion" in his cell throughout the first stages of the administrative remedy process. Id. ¶ 79(E)–(G); Defs.' SMF ¶ 79 (E)–(G). He mentioned in his first administrative grievance that violence by other inmates could occur without staff being aware until afterwards, and in his second grievance he described an inmate being seriously injured by other inmates without the "protection" of staff. SMF Resp. ¶ 79(E).

Defendants claim that Plaintiff had not raised, prior to his Complaint, the allegation that his lack of sleep meant that he could not work an eight-hour job, and that one correctional officer told him he could not be paid for his work in the prison recreational department. Defs.' SMF ¶ 79(H). Plaintiff responds that conditions making him unfit for work, including noise, commotion, light, ventilation problems, risk of violence, too-narrow beds, and others, had been alleged during the administrative process. SMF Resp. ¶ 79(H).

Defendants next contest the earlier presence of Plaintiff's cell sanitation complaints, including a lack of cleaning supplies despite the frequent need for the toilet to be cleaned, the authorization of orderlies to distribute some supplies, and the presence and potential of urine and feces splatter on the floor and toilets, one of which "extend[ed] approximately 4" beyond the open cell door." Defs.' SMF ¶ 79(I)–(L) (citing Compl. ¶ 19). Plaintiff argues that he complained about the poor sanitary conditions of the cell in the administrative remedy process, including the lack of cleaning supplies and the sale by orderlies of those cleaning supplies that were available.

SMF Resp. ¶ 79(I)–(L). Plaintiff also complained in his third and fourth grievances that the units were dirty and inmates were sick because of the lack of cleaning supplies. Id. ¶ 79(K).

Finally, Defendants claim that Plaintiff had not raised the issue of ventilation and cell temperature prior to his Complaint. Defs.' SMF ¶ 79(M). Plaintiff states that he raised the issue of poor ventilation at the administrative remedy level. SMF Resp. ¶ 79(M).

### 8. Injuries

At no point during his time at FCI Ray Brook did Plaintiff seek psychiatric treatment or counseling. Defs.' SMF ¶ 81. However, Plaintiff disputes Defendants' claims that Plaintiff suffered no physical or psychological injuries as a result of the conditions in Cell 127. SMF Resp. ¶¶ 80, 82. On the contrary, Plaintiff claims that Defendants' questioning in Plaintiff's deposition was misleading because they asked him if, four years later, he continues to suffer from physical maladies rather than asking if he was injured at the time. Id. ¶ 80. Plaintiff does claim that he was injured during his time at FCI Ray Brook, pointing to his involvement in fights in Cell 127 and the time he fell while trying to climb into his bunk without a ladder, allegedly injuring his leg. Id. As to psychological injuries, Plaintiff recalls "severe sleep deprivation," as well as exhaustion and depression, resulting from conditions that he considers to be "horrible" and "torture." Id. ¶ 82.

### 9. Bureau of Prisons ("BOP") and FCI Ray Brook Policies and Procedures

Groups of inmates arrive at FCI Ray Brook in buses, which are assigned to unit managers who determine each inmate's housing unit. Id. ¶¶ 85–86. The unit's correctional counselor then assigns the inmates to their cells and bunks. Id. ¶ 87. Six-man cell assignments are common for new inmates, but the inmates can request to move to a four- or two-man cell if they find a

cellmate who is compatible. Id. ¶¶ 88–89. When an inmate has more than a year remaining on their sentence, they meet with a case manager, a counselor, and a unit manager every six months for a Program Review, in which they "review the inmate's progress in his program plan and discuss any issues the inmate wants to raise." Id. ¶ 90.

Plaintiff disputes Defendants' claim that the FCI Ray Brook cells were locked on weekdays between the hours of 10:00 PM and 6:00 AM, claiming that the hours on weekdays were 9:15 PM to 6:00 AM "or later," and notes that Defendants' accounts vary as to when the cells were locked: defendant Salamy stated that "he believed the cells were locked from 9:15 or 9:30 PM to 6:00 AM." SMF Resp. ¶ 83; Defs.' SMF ¶ 83.

### 10. Administrative Remedy Process

The administrative remedy process is a formal grievance procedure for inmate complaints, established by the Bureau of Prisons and FCI Ray Brook. Defs.' SMF ¶ 91. The inmate grievance form ("BP-8") is the first step; it is filled out by the inmate and given to a staff member. Id. ¶ 92. Inmates can request a BP-8 from staff or get them from the library. Id. Plaintiff notes that staff could deny BP-8 requests. Id.; SMF Resp. ¶ 92. Defendant Sepanek, the correctional counselor, received the BP-8 forms from Mohawk B inmates and responded "unable to resolve" if the matter was not under her control. Defs.' SMF ¶ 93. The next step, the BP-9 form, is given to the warden's office, logged by an administrative remedy clerk, and assigned to a staff member for response. Id. ¶¶ 94–95. If an inmate is dissatisfied with the response, he may file a BP-10, which is a formal grievance to the Regional Office in Philadelphia, Pennsylvania, which oversees FCI Ray Brook. Id. ¶¶ 97–98. Upon an unsatisfactory response from the Regional Office, an inmate may file a BP-11 with the Central Office in Washington, D.C. Id. ¶ 100.

Plaintiff disputes Defendants' assertion that the staff member who receives the BP-9 drafts a response, which is read and generally signed by the warden. Defs.' SMF ¶ 96. According to Plaintiff, the warden signs the responses, but the warden also has the responsibility to review and revise as needed. SMF Resp. ¶ 96. Defendants claim that since the BP-10 is submitted directly by mail to the Regional Office, the forms and regional responses are not seen by FCI Ray Brook staff. Defs.' SMF ¶ 99. Plaintiff asserts that defendant Salamy testified that he has seen BP-10 responses and has been contacted by the regional office in response to a BP-10. SMF Resp. ¶ 99. According to Defendants, Plaintiff claims that Defendants violated his constitutional rights because they oversaw the conditions he complained of, and they were thus "on notice." Defs.' SMF ¶ 101. Plaintiff disputes this as "misleading." SMF Resp. ¶ 101. Plaintiff contends that Defendants' wrongdoing was based on more than mere oversight; there was "specific misconduct by Defendants, including failing to properly distribute cleaning supplies, failing to confirm the space per inmate was complaint with ACA standards, failing to investigate unreported violence in the six man cells, and failing to monitor noise levels at night." Id.

Plaintiff also states that he complained to Defendants during lunches before filing his BP-8. Pl.'s SMF ¶ 71. Plaintiff reiterates the claims in his BP-8, including overcrowding, no duress buttons, threat of violence, and lack of ladders. Id. ¶ 74(a)–(i). Plaintiff further states that defendant Sepanek signed the response to his BP-8, said that she was unable to resolve it, conducted no investigation, and did not resolve or address the issues. Id. ¶¶ 75–79. Plaintiff further chronicles his additional administrative relief forms: BP-9, BP-10, and BP-11, all of which were denied. Id. ¶¶ 80–92. Plaintiff complained in these forms of the threat and occurrence

of violence, overcrowding, lack of staff intervention, no duress buttons, no ladders, poor sanitation, and too much noise. Id.

### 11. ACA Accreditation[1]

The ACA accredited FCI Ray Brook in February 2010 after a 2009 audit. Defs.' SMF ¶ 102. From March 2008 to March 2009, the "average daily population of FCI Ray Brook" was 1235 inmates. Id. ¶ 111. In 2012, the ACA accredited FCI Ray Brook again after another audit. The inmate population in May 2012, at the time of the audit, was 1191. Id. ¶ 105. According to Plaintiff, the ACA "promulgates standards for the corrections industry and accredits correctional institutions that are in compliance with the ACA's published standards." Pl.'s SMF ¶ 18. It is "well-regarded" by the industry, and its standards are deemed "authoritative" as a baseline. Id. ¶¶ 19–21. The BOP requires prisons to be ACA accredited every three years. Id. ¶ 22. In the accreditation process, prisons self-report data and must self-report noncompliance with the ACA's standards. Id. ¶¶ 23–24. Plaintiff alleges that FCI Ray Brook did not comply with ACA standard 4-4129 throughout his entire time there, that it was at 154% of its rated capacity by housing 1230 prisoners when its rated capacity was 796 in April 2009, and that it was never at less than at 142% of its rated capacity. Id. ¶¶ 29–31. Finally, Plaintiff states that "[a]t no point" during his time in Cell 127 did Defendants determine if the cell complied with ACA standard 4-4132, which requires twenty-five square feet of unencumbered space per inmate in cells with two or more occupants. Id. ¶ 36; Dkt. 105-19 ("ACA Standard 4-4132") at 36.

---

[1] The ACA's standards, though frequently cited in Plaintiff's arguments, are by no means binding upon the Court. However, the Second Circuit has recognized the ACA and other such organization's standards as instructive examples of the "contemporary standards" of decency relevant to Eighth Amendment claims. Lareau v. Manson, 651 F.2d 96, 105-06 (2d Cir. 1981); see also Hutto v. Finney, 437 U.S. 678, 685 (1978).

In July, 2012, the ACA deleted its rated capacity standard, standard 4-4129. Defs.'
SMF ¶ 106. Plaintiff adds that the ACA subcommittee did so because of "continual confusion
amongst both facilities and auditors," and that the substance of the standard was "adequately
covered by the square footage and ratio requirements found in standard 4-4132." SMF Resp.
¶ 106. Plaintiff further notes that FCI Ray Brook did not comply with that standard either. Id. It is
undisputed that FCI Ray Brook did not request a waiver of the ACA unencumbered square
footage standard in either 2009 or 2012. Defs.' SMF ¶ 107. However, Plaintiff and Defendants
disagree as to the implication of the standard itself. According to Defendants, the standard
"recommends that multiple-occupancy cells provide twenty-five square feet of unencumbered
space per inmate." Id. ¶ 108. Plaintiff argues that it was a requirement, not a recommendation,
and if FCI Ray Brook failed to comply, they were required to request a waiver. SMF Resp. ¶ 108.
Plaintiff and Defendants also disagree over the since-deleted standard 4-4129, which dealt with
the number of inmates. Defendants stated that standard 4-4129 "recommended that the number of
inmates in an institution not exceed the institution['s] capacity, as is calculated by the Standards
Compliant Bed Facility Formula." Defs.' SMF ¶ 109. Plaintiff counters once again that the
standard is a requirement, not a recommendation, and that in the absence of compliance, FCI Ray
Brook did request a waiver of standard 4-4129. SMF Resp. ¶ 109. Plaintiff also dispute
Defendants' wording, stating that the "actual text" of the standard read "facility's rated bed
capacity" and not "institution's capacity." Id.

Finally, Plaintiff disputes Defendants' statement that "[t]he average daily population of
FCI Ray Brook from February 2011 through March December 2011 was 1142." Defs.' SMF

¶ 112. Plaintiff asserts that this "is not a real time period" and that the correct time period was "March 2011 through February 2012." SMF Resp. ¶ 112.

## III.    LEGAL STANDARD

### A.  Summary Judgment

A court shall grant summary judgment when no genuine issue of material fact exists between the parties and, on the undisputed facts, "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; <u>see also</u> <u>D'Amico v. City of New York</u>, 132 F.3d 145, 149 (2d Cir. 1998). The Court should not attempt "to weigh the evidence and determine the truth of the matter," but determine if an issue of fact remains on which a reasonable jury could differ. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). The burden of showing "no genuine issue of material fact" rests on the moving party, and "the Court must draw all reasonable inferences in favor of the non-moving party." <u>Gentile v. Potter</u>, 509 F. Supp. 2d 221, 230 (E.D.N.Y. 2007). The Court's role in a case of summary judgment is one of finding issues, not resolving them. <u>Gallo v. Prudential Residential Servs., Ltd. P'ship.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994). The nonmoving party must support its allegations by more than mere conclusory statements; "some hard evidence" must show that the nonmoving party's version of the facts "is not wholly fanciful." <u>D'Amico</u>, 132 F.3d at 149.

### B.  Eighth Amendment Claims

The Eighth Amendment's bar against cruel and unusual punishment extends to include conditions of imprisonment that are disproportionate and violate "broad and idealistic concepts of dignity, civilized standards, humanity, and decency." <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976) (quoting <u>Jackson v. Bishop</u>, 404 F.2d 571, 579 (8th Cir. 1968)). Two requirements must

be met for such an Eighth Amendment claim. First, the deprivation suffered by the plaintiff must be "sufficiently serious" such that it denies "the minimal civilized measure of life's necessities." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991); Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). Second, the plaintiff must show that the offender's actions amounted to a "wanton infliction of unnecessary pain." Estelle, 429 U.S. at 105. The standard for such wantonness is one of "deliberate indifference," which is met when an "official act[s] or fail[s] to act despite his knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 842. The official must actually know of the facts that could support an inference of such a risk, and must also draw the inference. Id. at 837. In addition to knowledge of the "substantial risk," the official must fail "to take reasonable measures to abate" the risk if he is to be found to have violated of the Eighth Amendment. Id. at 847.

### C. Qualified Immunity

Qualified immunity provides general protection to government officials from civil damages arising in the course of their discretionary functions, except for conduct that "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To be eligible for the protections of qualified immunity, the official must have acted in an objectively reasonable manner, such that the official did not know or had no reason to know that he was violating the victim's rights. Id. at 818–19. To prove that qualified immunity does not apply, there is a two step process. First, there must be a constitutionally protected right at stake; second, the contours of that right must be distinct enough "that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Although the unlawfulness of the

conduct need not have been absolutely recognized by law prior to the present action, "in the light of pre-existing law the unlawfulness must be apparent." Id.

## IV.    DISCUSSION

### A. Exclusion of Evidence

#### *1. Previously Withheld Evidence*

Plaintiff argues that two of Defendants' statements of fact were improperly substantiated. Both statements were related to the number of safety and sanitation grievances that inmates filed from March 2008 to March 2009 and from February 2011 to December 2011. Defs.' SMF ¶¶ 47–48. Plaintiff contends that during discovery, Defendants refused requests to provide "[a]ll [d]ocuments concerning reports or investigations of the placement or size of inmate beds, overcrowding, sanitation or ventilation problems, or excessive noise or light at Ray Brook, including but not limited to incidents identified in the complaint." SMF Resp. ¶¶ 47–48 (first alteration in original). Defendants refused this request as "outside the scope" of the case but then introduced evidence of documents relating to sanitation and safety to support their statements of material fact. Id.; see also Defs.' SMF ¶¶ 47–48. Rule 37(c)(1) of the Federal Rules of Civil Procedure states that "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Under Rule 26(a)(1)(A)(ii), parties must provide "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to

support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii).

Here, the documents requested by Plaintiff fall squarely under the scope of Rule 26(a)(ii) because they are documents that the disclosing parties used to support their defense in their Motion for Summary Judgment. Under Rule 37(c)(1), the failure to provide information cannot be considered harmless because sanitation and safety go to the heart of Plaintiff's claims. Dkt. No. 111 ("Response") at 13–17. Nor did Defendants provide any arguments that would substantially justify Defendants' failure of production. Therefore, pursuant to Rule 37(c)(1) and Rule 26(a)(ii), Defendants may not use this evidence to support these two statements on their Motion for Summary Judgment.

### 2. Plaintiff's Affidavit

Defendants allege that Plaintiff's Affidavit, submitted in December 2015, should be excluded under the "sham affidavit" rule. Dkt. No. 112 ("Reply") at 1–2. Under this rule, "factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). When only inconsistencies between Plaintiff's deposition and affidavit create a dispute of material fact, summary judgment may well be warranted. Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 577–78 (2d Cir. 1969). However, a witness's conflicting affidavit and deposition must *not* be excluded "from consideration in the determination of the question whether there is any genuine issue as to any material fact." Id. at 578 (quoting 6 Moore, Federal Practice ¶ 56.22[1] at 2814 (2d ed. 1965)).

Here, despite Defendants' claims, Plaintiff's Affidavit generally adds to his narrative of facts rather than contradict it. As early as his Complaint, filed in 2011, Plaintiff reported his fall from his bunk, the problems with gang members, sanitary issues, overcrowding, and Defendants' awareness of the conditions. Compl. ¶¶ 3–13, 18–20. Defendants dispute many of the particulars surrounding these allegations, but those disputes by no means arise solely from Plaintiff's recent Affidavit. Therefore, Plaintiff's Affidavit does not implicate the "sham affidavit" rule and will be included in the determination of genuine disputes of material fact.

## B. Summary Judgment

### 1. Immaterial and Nonexistent Disputes of Fact

For summary judgment to be granted, no genuine dispute of a material fact may remain between the parties. Fed. R. Civ. P. 56. Here, though Plaintiff claims to dispute many of Defendants' stated material facts, a number of Plaintiff's objections are not material in nature. Further, Plaintiff does not genuinely dispute some of the facts listed as "disputed."

Defendants claim that each inmate had a chair that he could remove from the cell and store by stacking. Defs.' SMF ¶ 3. Plaintiff argues that there was no evidence that inmates could leave the chairs outside the cells or that they could or did stack them; however Plaintiff does not provide any evidence rebutting Defendants' claim. SMF Resp. ¶ 3; see also D'Amico, 132 F.3d at 149 (holding that the nonmoving party must provide more than mere conclusory statements in opposing summary judgment).

Similarly, Plaintiff contends that Defendants are wrong to state that inmates could leave their cells throughout the day for various activities because, according to Plaintiff, this statement

suggests that the activities were available at any time to all inmates. SMF Resp. ¶ 8. Plaintiff's characterization of the fact is not a genuine dispute of the fact itself.

Plaintiff's and Defendants' measurements of the square footage of space and unencumbered space in Cell 127, though differing, both place the figure for unencumbered square feet per inmate under the ACA standard at issue: that each inmate in a six-man cell is entitled to twenty-five square feet of unencumbered space. SMF Resp. ¶¶ 5–6, 108.

Several of Plaintiff's disputes regarding Defendants' statements about ventilation and cell temperature are either not genuine or not material. Plaintiff states that the airflow surveys that Defendant cites from 2009 are neither a complete nor accurate representation of the air circulation in Mohawk B, but Plaintiff does not dispute the existence of the results as cited by Defendants. SMF Resp. ¶ 10. Likewise, Plaintiff's objections to statements about the windows and food slots relate to issues and practicalities of their use, not to their existence or to the fact that they were used as a source of ventilation. Id. ¶¶ 11, 13, 19. Moreover, in response to Defendants' statement that Plaintiff did not suffer "any specific health problems" related to temperature or ventilation issues, Plaintiff responded that the temperatures were "deleterious to his health," but fails to provide any specific instance or issue. Id. ¶ 21.

As with the unencumbered space square footage, Plaintiff and Defendants differ in their measurement of the cell bunks. However, both measurements are less than thirty-two inches, the measurement that Plaintiff states was required. Compl. ¶ 7 n.4.; SMF Resp. ¶ 27. Plaintiff and Defendants also disagree over whether Plaintiff requested a lower bunk; Defendants claim that he never did, but Plaintiff argues that he cannot recall and the request was at least implicit because

of his formal complaints about the lack of ladders. Id. ¶ 25. Plaintiff, however, does not establish that an actual request was made, thus failing to establish a genuine dispute of fact.

In regard to Defendants' reports of incidents of inmate-inmate assault (with and without weapons), Plaintiff disputes all the listed reports on the grounds that Defendants only provided reported instances, and these were further self-reported to the ACA by FCI Ray Brook, thus making the veracity uncertain. SMF Resp. ¶¶ 49–52. This is not a dispute of the stated facts, however, but a question of credibility. Plaintiff also disputes the statement that he was involved in just one physical altercation because he described only one; he states that he was involved in other physical fights but could not recall specifics. Id. ¶ 57. However, Defendants did not state that Plaintiff was involved in "only" one physical altercation, but merely referenced the only altercation that Plaintiff described. Therefore, this does not rise to the level of a genuine dispute of fact. Plaintiff also disputes that he did not request a cell reassignment for over two years because Plaintiff considered such a request futile, though he also contends that his expressed displeasure should be considered. Id. ¶¶ 59–60. Plaintiff did wait for two and a half years to formally make the request. Id.

Plaintiff and Defendants also disagree over the hours during which the cells at FCI Ray Brook were locked. Defendants report that the cells were locked from 10:00 PM to 6:00 AM; Plaintiff alleges that they were locked from 9:15 PM to 6:00 AM SMF Resp. ¶ 83. One of the ACA standards in dispute, Standard 4-4132, states a square footage standard linked to periods of locked confinement of ten hours or more. ACA Standard 4-4132 at 36. Plaintiff argues in his Response that his confinement was for nine to ten hours or more per day. Resp. at 6. Absent other

evidence, Plaintiff's and Defendants' factual allegations do not appear to create a dispute as to the fact that the cell was not locked for more than what the ACA standard allowed.

Plaintiff disputes Defendants' statement that results from noise level surveys from 2011 were "within ACA guidelines," but Plaintiff only disputes whether the surveys were complete and representative of the noise levels, not that the results were as Defendants describes. SMF Resp. ¶ 67. Additionally, Plaintiff disputes Defendants' claim that "a staff member drafts a response to the BP-9, which is read and generally signed by the Warden" because Plaintiff adds that the warden's duties also involved review and revision. Id. ¶ 96. Again, this is supplemental information, not a dispute. Similarly, Plaintiff does not dispute that he alleged a constitutional violation by Defendants on the basis that they oversaw the conditions at issue; rather, he only adds that specific instances of misconduct also occurred. Id. ¶ 101.

Plaintiff twice disputes Defendants' statements because of incorrect date statements. SMF. Resp. ¶¶ 7, 112. Plaintiff's corrections are consistent with the record, supporting a determination that these statements on Defendants' part are immaterial typographical errors. Dkt. No. 111-23 ("Inmate Assignments"); Dkt. No. 105-18 ("2012 ACA Accreditation Report") at 11.

### 2. Genuine Disputes of Material Fact

Two prongs are necessary to satisfy an Eighth Amendment claim in this case. First, the treatment of the prisoners must rise beyond legitimate punishment to a serious deprivation of an important need such as food and shelter. Farmer, 511 U.S. at 833–34. Second, the treatment must have been inflicted wantonly, with "deliberate indifference" such that those at fault knew or had reason to know of the "substantial risk of harm." Id. at 842. Effects of the unconstitutional conditions are key to determining a violation. Zolnowski v. County of Erie, 944 F. Supp. 1096,

1110 (W.D.N.Y. 1996) (citing <u>Rhodes</u>, 452 U.S. at 367). Here, Plaintiff must prove genuine disputes as to facts that materially satisfy the serious deprivation and deliberate indifference requirements.

<u>a. Serious Deprivation of an Important Need</u>

In regard to the first prong, Plaintiff has disputed various statements by Defendants relating to injuries and risk of injury resulting from overcrowding and insufficient resources, and the ACA standards concerning overcrowding.

First, Plaintiff disputes Defendants' claim that Plaintiff did not suffer any "specific hardship" due to the absence of ladders. Defs.' SMF ¶ 26. Plaintiff contends that he did suffer several hardships, including a specific incident where he fell and injured himself when he was using a chair from the cell to get into his bunk, because there were no ladders. SMF Resp. ¶ 26. He also states that having to step on others' belongings "increased [the] risk of violence." <u>Id.</u>

Second, Plaintiff also disputes Defendants' claim that chemical cleaners were delivered once a week, claiming instead that they were delivered roughly once per month.[2] SMF Resp. ¶ 36. The possible gravity of such a discrepancy is illustrated by Plaintiff's allegation that the toilets in his cell needed to be cleaned "at least 15–20 times a day." Compl. ¶ 19.

---

[2] Plaintiff alleges disputes against several of Defendants' statements about cell sanitation, but they are either not genuine or not material. Defendants claim that various cleaning supplies were issued and provided to inmates; Plaintiff counters that they were "often not made available to inmates for long periods of time" and sometimes the unit ran out altogether for up to a month. SMF Resp. ¶¶ 31, 33–35. This is not a genuine dispute because Plaintiff does not actually dispute the existence of the products or that they were provided to inmates; Plaintiff only contests the frequency and consistency. Defendants also state that Plaintiff did not report problems with the cell toilet to staff. Defs.' SMF ¶ 45. Plaintiff claims to have reported it in his BP-10, but in fact he only said that the unit was "dirty." SMF Resp. ¶ 45; Administrative Grievances at 7.

Third, Plaintiff counters Defendants' claim that inmates listened to the common area TVs through headsets, noting that they actually used booster speakers, which contributes to his allegations of too much noise and difficulty sleeping. SMF Resp. ¶ 69.

Fourth, Plaintiff alleges both physical and psychological injuries that occurred at FCI Ray Brook. Id. ¶¶ 80, 82. He states that he was physically injured in his fall from the bunk and from fights, and that his psychological injuries include "severe sleep deprivation," exhaustion, and depression. Id. Defendants, conversely, state that Plaintiff suffered no physical or psychological injuries. Defs.' SMF ¶¶ 80, 82.

The fifth and final dispute is Plaintiff's and Defendants' disagreement over whether two of the ACA's standards (4-4129 and 4-4132) were requirements, as Plaintiff described them, or recommendations, as Defendants described them. SMF Resp. ¶¶ 108–09.

Courts support a "totality of the circumstances" consideration for determining if inmates' Eighth Amendment rights are being violated. Lareau v. Manson, 651 F.2d 96, 107 (2d Cir. 1981); see also Peterkin v. Jeffes, 855 F.2d 1021, 1025 (3d Cir. 1988) (citing Union Cty. Jail Inmates v. Di Buono, 713 F.2d 984, 1000–01 (3d Cir.1983)) (holding that objective factors considered in the totality of the circumstances inquiry include the state of the facilities, the length of inmates' prison terms, time spent in cells daily, and out of cell activity opportunities). The Second Circuit defined "specific categories of Eighth Amendment concern" that required inmates to be provided "adequate food, clothing, shelter, sanitation, medical care and personal safety." Lareau, 651 F.2d at 106 (quoting Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd in part on other grounds, Bell v. Wolfish, 441 U.S. 520 (1979)). In terms of inmate safety, courts have recognized officials'

duty to protect prisoners from violence and the dangers of an inmate being labeled a "snitch" for reporting problems. <u>Watson v. McGinnis</u>, 964 F. Supp. 127, 131 (S.D.N.Y. 1997).

Defendants urge that overcrowding does not on its own constitute Eighth Amendment violation, thus attempting to undercut one of Plaintiff's core arguments. Dkt. No. 105-1 ("Memorandum") at 5; <u>see also</u> <u>Chapdelaine v. Keller</u>, No. 95-CV-1126, 1998 WL 357350, at *5 (N.D.N.Y. Apr. 16, 1998) ("[A] lack of living space in of itself does not violate the Eighth Amendment."). However, in the instant case, the Second Circuit previously denied Defendants' Motion to dismiss, holding that Plaintiff "plausibly alleged that the overcrowding and lack of living space in his cell were exacerbated by the ventilation, noise, sanitation, and safety issues, leading to deprivations of specific life necessities." <u>Walker v. Schult</u>, 717 F.3d 119, 128 (2d Cir. 2013). The Second Circuit distinguished Plaintiff's case from the <u>Chapdelaine</u> case relied on by Defendants, noting that Plaintiff's six-man cell (as opposed to the four-man cell in <u>Chapdelaine</u>) could pose "additional, greater risks to the inmates' health and safety." <u>Walker</u>, 717 F.3d at 129. Here, Plaintiff has alleged that the overcrowding, when coupled with lack of sufficient cleaning resources, led to unsanitary conditions involving the cells' toilets, physical injury, risk of violence, and at least one instance of actual violence. <u>See</u> Compl. Further, one of the facts in dispute is the sound of the televisions in the common area, which Plaintiff alleges to have deprived him of sleep. SMF Resp. ¶ 69. The Second Circuit has also recognized that "sleep is critical to human existence" and deprivation of sleep "has been held to violate the Eighth Amendment." <u>Walker</u>, 717 F.3d at 126 (citing <u>Tafari v. McCarthy</u>, 714 F. Supp. 2d 317, 367 (N.D.N.Y. 2010)). Another relevant factor is the dispute regarding the ACA's standards. Under the Supreme Court's modernized standard for prison conditions in accordance with Eighth Amendment, "[t]he

Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" <u>Estelle</u> 429 U.S. at 102 (quoting <u>Jackson</u>, 404 F.2d at 579). Though administrative standards are not a constitutional component of the Eighth Amendment analysis, the Second Circuit specifically mentioned the ACA and other such organizations as an example of "acceptable minimum conditions" for courts to consider in satisfying the contemporary standard of the Eighth Amendment articulated by the Supreme Court. <u>Lareau</u>, 651 F.2d at106. If the ACA's standards are requirements, as Plaintiff argues, FCI Ray Brook's failure to comply with this example of "acceptable minimum conditions" would be yet another circumstance aggravating the overcrowding issue central to Plaintiff's claim, since noncompliance would make it difficult to use the standard as a means of determining whether the housing facilities were, indeed, adequate.

These remaining disputes between Plaintiff and Defendants are material to the "totality of the circumstances" Eighth Amendment consideration because, if Plaintiff proves all of the facts he alleges, he would prove multiple deprivations of the sort of necessities recognized by higher courts. <u>Lareau</u>, 651 F.2d at 106. Plaintiff has alleged a lack of adequate sanitation, physical injuries, inmate-inmate violence, severe sleep deprivation, combined with undisputed facts concerning overcrowding, cell temperatures, and ventilation that, taken as a whole, are sufficient to succeed on an Eighth Amendment claim. <u>Walker</u>, 717 F.3d at 129 (stating that, depending on the development of the factual record, at the very least "the facts asserted in Walker's complaint plausibly alleged unconstitutional conditions of confinement."). Because genuine disputes of material fact remain as to the alleged deprivations suffered by Plaintiff, Defendants are not entitled to summary judgment in this matter and the facts of Plaintiff's confinement remain triable issues for a jury to decide.

### b. Wanton Misconduct

Plaintiff and Defendants dispute various facts relating to how and if Defendants were made aware of the alleged deprivation. "[D]eliberate indifference entails something more than mere negligence [but] it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835; accord Estelle, 429 U.S. at 104–05. However, failure to provide actual notification in "failure to protect" cases under the Eighth Amendment is not fatal to a claim. Farmer, 511 U.S. at 848. "Evidence that a risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." Brock v. Wright, 315 F.3d 158, 164 (2d Cir. 2003) (citing Farmer, 511 U.S. at 842).

Defendants argue that, for a Bivens claim such as this to succeed, "each defendant's conduct must be independently assessed" to determine if they have each been deliberately indifferent. Reply at 7. Plaintiff disputes Defendants' claims that (1) Plaintiff did not raise issues of safety with staff during his time at Cell 127, (2) his request to move from Cell 127 was honored shortly after it was made, (3) Plaintiff did not report overcrowding prior to filing his BP-8, (4) a variety of allegations were never raised before Plaintiff's Complaint, and (5) BP-10 complaints were never seen by FCI Ray Brook staff. Defs.' SMF ¶¶ 56, 61, 75, 79(C)–(M). In opposition, Plaintiff cites his multiple formal grievances that raised safety concerns. SMF Resp. ¶ 56. As to his request to move, Plaintiff states that he implicitly requested a reassignment in his formal grievances, and Defendants failed to honor those requests in a timely fashion. Id. ¶ 61. Further, Plaintiff argues that requests were futile because they required an invitation from an inmate in a two-man cell. Id. Plaintiff also states that he verbally reported overcrowding issues to all

Defendants prior to filing his BP-8, and that the remaining disputed claims in his Complaint, which Defendants contend were not previously raised, were raised verbally and throughout the administrative remedy process. Id. ¶¶ 75, 79(C)–(M). Finally, Plaintiff disputes Defendants' allegation that the BP-10 complaints were sent directly to the Regional Office and thus those complaints and the Regional Office's responses were not seen by staff at FCI Ray Brook. Plaintiff cites defendant Salamy's testimony in which Salamy admitted to seeing BP-10 responses and further stated that the regional office sometimes contacted him in response to BP-10s. Id. ¶ 99.

Defendants argue that Plaintiff assumes a report to one Defendant would inform them all. Mem. at 8. Plaintiff, however, is claiming that he complained to all of the Defendants regarding the conditions he now alleges to be unconstitutional. SMF Resp. ¶ 75. In determining wantonness, the key factor is not the effect on the inmate but instead the "constraints facing the official[s]." Zolnowski, 944 F. Supp. at 1110 (quoting Wilson, 501 U.S. at 303). The disputes between Plaintiff and Defendants are not resolved in regard to the roles played by the Defendants in their various positions of authority or what constraints bound their conduct. Plaintiff argues that all Defendants were aware of his grievances and yet did not act to remedy the problems or to protect him. SMF Resp. ¶ 75. Defendants claim that many of Plaintiff's complaints were not made known to them, and that Plaintiff did not provide them individually with sufficient information. Defs.' SMF ¶¶ 56, 61, 75, 79(C)–(M). These directly conflicting representations of Defendants' knowledge make it impossible for the Court to grant summary judgment because these factual disputes go to the heart of Plaintiff's Eighth Amendment claim. Farmer, 511 U.S. at 835–36. As to the constraints facing the officials, Plaintiff and Defendants' disagreement over who had the responsibility of handling the administrative grievances is illustrative of the remaining material

disputes relating to the Defendants' individual responsibilities. SMF Resp. ¶¶ 56, 61, 99. Since awareness of an obvious risk can be sufficient for a jury to find for the plaintiff, these disputes concerning Defendants' awareness of the alleged substantial risks to Plaintiff constitute triable issues of fact. Brock v. Wright, 315 F.3d 158, 164 (2d Cir. 2003) (citing Farmer, 511 U.S. at 842).

### C. Qualified Immunity

Defendants have also argued that they are entitled to qualified immunity and are therefore entitled to summary judgment. For government officials to be protected by qualified immunity from liability for civil damages, their conduct must be objectively reasonable so that the official neither knew nor had reason to know that he or she was violating the plaintiff's rights. Harlow, 457 U.S. at 818–19; Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). The two-step process for removing the protections of qualified immunity requires that first, the defendant violated a constitutionally protected right when the evidence is viewed in the light most favorable to the plaintiff, and second, "that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640; Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010). Unlawfulness of the conduct must be apparent based on pre-existing law, which can be true even if it is not specifically defined as unlawful. Anderson, 483 U.S. at 640.

"If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court." Dudley v. City of Glens Falls, No. 12-CV-429, 2013 WL 5347291, at *6 (N.D.N.Y. Sept. 23, 2013) (citing Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007)). However, unresolved factual issues are resolved by the jury before a court makes the final determination regarding qualified immunity. Id. (citing Zellner, 494 F.3d at 368); see also Stephenson v. Doe, 332 F.3d 68, 81 (2d Cir. 2003). Indeed, a

finding of qualified immunity is appropriate when "the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendants' conduct under the circumstances." Lennon v. Miller, 66 F.3d 416, 421 (2d Cir. 1995)

Genuine disputes of material fact remain between Plaintiff and Defendants, and therefore the determination of a constitutional violation cannot be decided by this Court on a motion for summary judgment. The Court's duty here is to identify issues that stand between the parties, not to resolve them. Gallo, 22 F.3d at 1224. When analyzing a claim of qualified immunity, the facts must be construed in favor of the plaintiffs. Lennon, 66 F.3d at 420. Plaintiff's and Defendants' disputes represent two opposed versions of fact. It is possible that the conditions of Plaintiff's cell combine to constitute an Eighth Amendment violation in regards to lack of proper sanitation, adequate space, and safety. It is also possible that Plaintiff's repeated complaints made Defendants aware of the substantial risk of harm, such that their failure to provide remedies amounted to deliberate indifference. These are questions for a jury to decide. Summary judgment on the issue of qualified immunity is not warranted based on the facts provided by the parties.

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion for Summary Judgment is **DENIED**, and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED**

DATED:     August 09, 2016
           Albany, New York

Lawrence E. Kahn
U.S. District Judge