UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ELLIS WALKER,

                        Plaintiff,

      -v-                                    9:11-CV-287

DEBORAH G. SCHULT,
Warden, FCI Ray Brook,
RUSSELL PERDUE, Warden,
FCI Ray Brook, and SEPANEK,
Counselor, FCI Ray Brook,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                             OF COUNSEL:

LATHAM, WATKINS LAW FIRM                  BLAKE T. DENTON, ESQ.
Attorneys for Plaintiff                   ELIZABETH A. MORRIS, ESQ.
885 Third Avenue, Suite 1000              ERIC M. BROAD, ESQ.
New York, NY 10022                        GREGORY S. MORTENSON, ESQ.
                                          LEAH FRIEDMAN, ESQ.
                                          MEGAN A. BEHRMAN, ESQ.
                                          RONALD A. WESTGATE, III, ESQ.
                                          SHARON M. CASOLA, ESQ.
                                          WILLIAM O. RECKLER, ESQ.

U.S. DEPARTMENT OF JUSTICE                JAMES G. BARTOLOTTO, ESQ.
Specialized Tort Litigation               KELLY E. HEIDRICH, ESQ.
Attorneys for Defendants
1425 New York Avenue NW
Washington, DC 20005

U.S. DEPARTMENT OF JUSTICE                JEAN M. CUNNINGHAM, ESQ.
Civil Division
Attorneys for Defendants
P.O. Box 7146, Ben Franklin Station
Washington, DC 20044

DAVID N. HURD
United States District Judge

# **TABLE OF CONTENTS**

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

II.     BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

III.    LEGAL STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

      A.      Motions in Limine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

      B.      Expert Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

IV.     DISCUSSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

      A.      Plaintiff's Motions in Limine.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
              1.      Documents Not Produced in Discovery. . . . . . . . . . . . . . . . . . . . .   14
                  a.      Diagram of Cell 127. . . . . . . . . . . . . . . . . . . . . . . . . . . .   15
                  b.      Other Diagrams. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15
                  c.      Plaintiff's Grievances. . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
                  d.      Medical Leave Form. . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
              2.      Areas Outside of Cell 127. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
              3.      Grievances Filed Elsewhere. . . . . . . . . . . . . . . . . . . . . . . . . . . .   17
              4.      Prior Convictions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
              5.      The BOP.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
              6.      Defendants' Financial Status. . . . . . . . . . . . . . . . . . . . . . . . . . .   22
              7.      FCI Ray Brook's History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

      B.      Defendants' Motions in Limine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24
              1.      Acts or Omissions of Non-Parties.. . . . . . . . . . . . . . . . . . . . . . . .   25
              2.      Lawsuits Filed by Other Inmates. . . . . . . . . . . . . . . . . . . . . . . . .   27
              3.      Grievances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
              4.      Indemnification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
              5.      Abstract Value of Constitutional Rights. . . . . . . . . . . . . . . . . . . .   29

      C.      Motion to Preclude Dr. Gilligan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

      D.      Jury Visit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

      E.      Judicial Notice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

      F.      Electronic Equipment and Demonstrative Evidence. . . . . . . . . . . . . . . . .   40

V.      CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

# MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

On March 16, 2011, plaintiff Ellis Walker ("Walker" or "plaintiff"), proceeding pro se, filed this action alleging that various officials employed by the Federal Bureau of Prisons ("BOP") violated his Eighth Amendment rights.

According to the complaint, defendants Warden Deborah G. Schult ("Warden Shult"), Warden Russell Perdue ("Warden Perdue"), and Counselor Jackii Sepanek ("Counselor Sepanek") (collectively "defendants")[1] forced Walker to endure hazardous, unsanitary conditions in a dangerous, overcrowded prison cell at the Federal Correctional Institution in Ray Brook, New York ("FCI Ray Brook").

On August 25, 2011, defendants moved to dismiss Walker's complaint under Federal Rules of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6). Defendants argued that plaintiff failed to: (1) exhaust his administrative remedies; (2) adequately plead an Eighth Amendment claim; or (3) sufficiently allege the personal involvement of the named defendants. Defendants further argued that qualified immunity shielded them from liability.

On January 20, 2012, U.S. Magistrate Judge Randolph F. Treece filed a Report–Recommendation and Order in which he: (1) construed plaintiff's complaint as one filed under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)[2]; (2) declined to conclude plaintiff failed to administratively exhaust; but nevertheless (3) agreed that plaintiff failed to state an Eighth Amendment claim, concluding

---

[1] Walker's initial filing named additional defendants, all of whom have since been dismissed.

[2] Walker filed this lawsuit using a form complaint for civil actions under 42 U.S.C. § 1983, but Bivens provides for damages actions when a *federal* official violates a plaintiff's constitutional rights.

in the alternative that defendants were entitled to qualified immunity as to some of the conduct alleged.  Walker v. Shult, 2012 WL 1037441 (N.D.N.Y. Jan. 20, 2012).

On February 27, 2012, still pro se, Walker filed several objections to Judge Treece's Report–Recommendation and Order.  Those objections were overruled by Senior U.S. District Judge Lawrence E. Kahn, who adopted in full the Report–Recommendation and Order and dismissed plaintiff's complaint.  Walker v. Shult, 2012 WL 1037442 (N.D.N.Y. Mar. 27, 2012).  Plaintiff appealed.[3]

On May 23, 2013, the U.S. Court of Appeals for the Second Circuit affirmed in part and reversed in part the dismissal of Walker's complaint.  Walker v. Shult, 717 F.3d 119 (2d Cir. 2013).  As relevant here, the panel held that:

> the district court erred by dismissing Walker's complaint for failure to state a claim.  First, he plausibly alleged conditions that, perhaps alone and certainly in combination, deprived him of a minimal civilized measure of life's necessities.  Second, he plausibly alleged that defendants were deliberately indifferent to this deprivation. Third, he plausibly alleged violations of clearly established rights.

Id. at 126.

On June 11, 2014, following limited discovery, defendants moved under Rule 56 for partial summary judgment on the basis that Walker failed to exhaust his administrative remedies in accordance with the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), which requires a plaintiff to comply with available prison grievance procedures as a precondition to bringing suit.  Notably, defendants' briefing advanced the notion that plaintiff failed to properly exhaust each of *twelve* distinct claims.

---

[3] Plaintiff thereafter obtained counsel, though it is unclear from the extant record precisely when that occurred.

On October 15, 2014, Judge Treece filed a Report–Recommendation and Order rejecting defendants' characterization of Walker's complaint, observing that the "stirring description" of cell conditions set forth by plaintiff was not "merely an array of discrete allegations and independent claims" but instead "one overarching Eighth Amendment conditions of confinement claim."

Judge Treece therefore recommended denying defendants' motion because Walker "procedurally and substantively complied" with the grievance process as to this single, overarching claim even though he did not individually "grieve every single fact or issue he encountered stemming from or exacerbated by his incarceration in an overcrowded cell."

On November 3, 2014, defendants objected to the portion of Judge Treece's Report–Recommendation and Order that concluded Walker asserted, and then properly exhausted, "one overarching conditions-of-confinement claim." Those objections were overruled by Judge Kahn, who adopted in full the Report–Recommendation and Order and denied defendants' motion for partial summary judgment on exhaustion. Walker v. Schult, 2014 WL 7014674 (N.D.N.Y. Dec. 11, 2014).

On November 30, 2015, following the remainder of discovery, defendants again moved under Rule 56 seeking summary judgment. This time around, defendants argued Walker failed to marshal sufficient evidence to succeed on the merits of his Eighth Amendment conditions-of-confinement claim. In the alternative, defendants renewed their assertion that qualified immunity shielded them from individual liability. Judge Kahn rejected those arguments and denied defendants' motion. Walker v. Shult, 2016 WL 4203536 (N.D.N.Y. Aug. 9, 2016).

On October 11, 2016, defendants noticed an interlocutory appeal from Judge

Kahn's Memorandum–Decision & Order denying summary judgment (presumably on the

immunity issue), but later moved to voluntarily dismiss that appeal in favor of taking the case

to trial. Schult v. Walker, 2016 WL 9819317 (2d Cir. Oct. 18, 2016). Thereafter, Judge Kahn

transferred the matter to Senior U.S. District Judge Thomas J. McAvoy.

On September 27, 2017, Walker's case was reassigned to this Court. The parties

have filed or renewed motions seeking various rulings in advance of the trial, which is now

re-set for May 13, 2019 in Utica, New York. The motions have been fully briefed and will be

considered on the basis of the submissions without oral argument.

## II. __BACKGROUND__[4]

On November 18, 2008, Walker arrived at FCI Ray Brook, where Counselor Sepanek

assigned him to the top bunk of a bed in Cell 127 in the Mohawk Unit B building. Although

intended to house only four adult male inmates, defendants used Cell 127 to hold six men for

most of the roughly two and a half years plaintiff spent confined at the facility.

During this period, Walker shared the overcrowded accommodations in Cell 127 with a

rotating cast of cellmates. According to plaintiff, the fully occupied cell afforded each man

fewer than seventeen square feet of space, a number which falls significantly below the

relevant minimum standards outlined by the American Correctional Association ("ACA").

Walker claims the taxing conditions in Cell 127 led to violence, sleep deprivation, and

sanitation problems. According to plaintiff, inadequate ventilation and extreme swings in

temperature exacerbated this state of affairs. Plaintiff alleges that even though he repeatedly

---

[4] The parties' familiarity with the extensive background of this case is assumed for purposes of resolving the pending motions.

complained about the conditions in Cell 127, no named defendant ever investigated the matter or took meaningful steps to remedy the problems. Instead, plaintiff received boilerplate denials to his written grievances, including two signed by Warden Schult and Counselor Sepanek. Plaintiff's ordeal ended in April 2011, when authorities transferred him to another facility.

Defendants see things differently, of course. They claim that virtually all of the conditions about which Walker complains were standard features of BOP-run prisons that the named defendants were powerless to change. And while they acknowledge he spent time at FCI Ray Brook in Cell 127 with various other inmates, they insist plaintiff must be exaggerating his story—after all, he waited well over a year before he filed any grievances about the conditions in his cell. They also note that although all the remaining defendants were employed at FCI Ray Brook for at least *some* of the relevant time period, Warden Perdue only overlapped with the final few weeks of plaintiff's stay. According to defendants, only Counselor Sepanek actually worked in plaintiff's housing unit.

## III. **LEGAL STANDARDS**

### A. **Motions in limine**

"As a general matter, all relevant evidence is admissible under the Federal Rules of Evidence unless specifically excluded." United States v. Perez, 387 F.3d 201, 209 (2d Cir. 2004) (Cardamone, J.) (citing FED. R. EVID. 402). Evidence is "relevant" if (a) "it has any tendency to make a fact more or less probable than it would be without the evidence" and (b) "the fact is of consequence in determining the action." FED. R. EVID. 401.

"This standard should be interpreted liberally." Perez, 387 F.3d at 209. As courts have repeatedly observed, "[t]he standard of relevance established by the Federal Rules of

Evidence is not high." Hart v. RCI Hosp. Holdings, Inc., 90 F. Supp. 3d 250, 257 (S.D.N.Y. 2015) (citation and internal quotation marks omitted).

However, relevant evidence may be excluded if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needless presenting cumulative evidence." FED. R. EVID. 403. "Evidence is considered prejudicial if it involves some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence." Hart, 90 F. Supp. 3d at 257 (citation and internal quotation marks omitted).

"District courts analyzing evidence under Rule 403 should consider whether a limiting instruction will reduce the unduly prejudicial effect of the evidence so that it may be admitted." United States v. Ferguson, 246 F.R.D. 107, 117 (D. Conn. 2007) (citation omitted). "As the Supreme Court has recognized, limiting instructions are often sufficient to cure any risk of prejudice." United States v. Walker, 142 F.3d 103, 110 (2d Cir. 1998) (citing Zafiro v. United States, 506 U.S. 534, 539 (1993)).

A party seeking a ruling on the admissibility at trial of certain anticipated evidence may file a motion *in limine*. See, e.g., Highland Capital Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) ("A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*.").

Loosely translated, a motion *in limine* is a motion made "on or at the threshold." Luce v. United States, 469 U.S. 38, 40 n.2 (1984). "The term is used in the 'broad sense to refer to any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered.'" SLSJ, LLC v. Kleban, 277 F. Supp. 3d 258, 263 n.5 (D. Conn. 2017) (quoting Luce, 469 U.S. at 40 n.2).

"Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." Jean–Laurent v. Hennessy, 840 F. Supp. 2d 529, 536 (E.D.N.Y. 2011) (citation omitted).  "The movant has the burden of establishing that the evidence is not admissible for any purpose." United States v. Goodale, 831 F. Supp. 2d 804, 808 (D. Vt. 2011).  "The trial judge may reserve judgment on a motion *in limine* until trial to ensure the motion is considered in the proper factual context." Id.  "The court's ruling regarding a motion *in limine* is 'subject to change when the case unfolds." Highland Capital Mgmt., L.P., 551 F. Supp. 2d at 176 (citation and internal quotation marks omitted).

## B. Expert Testimony

Federal Rule of Evidence 702 permits a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise" provided that:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied those principles and methods to the facts of the case.  FED. R. EVID. 702.

"The law assigns district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of Rule 702." United States v. Farhane, 634 F.3d 127, 158 (2d Cir. 2011), cert. denied, 132 S. Ct. 833 (2011).  This role as gatekeeper requires a court to make three, related findings before permitting a person to testify as an expert:  "(1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will 'assist the trier of fact.'" Valente v. Textron, Inc., 931 F. Supp. 2d 409, 415 (E.D.N.Y. 2013) (quoting Nimely v.

<u>City of New York</u>, 414 F.3d 381, 396-97 (2d Cir. 2005)).

In <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993), the Supreme Court set forth a non-exhaustive list of factors that bear on the reliability aspect of this inquiry:  "(1) whether a theory or technique has been or can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." <u>United States v. Williams</u>, 506 F.3d 151, 160 (2d Cir. 2007).  "These factors do not constitute, however, a definitive checklist or test.  Rather, [t]he inquiry envisioned by Rule 702 is . . . a flexible one." <u>Davis v. Carroll</u>, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013) (citation omitted).

The flexibility contemplated by Rule 702 is particularly helpful when an expert's testimony does not rest on traditional scientific methods.  "In such cases, where a proposed expert witness bases her testimony on practical experience rather than scientific analysis, courts recognize that '[e]xperts of all kinds tie observations to conclusion through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'" <u>Davis</u>, 937 F. Supp. 2d at 412 (quoting <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 149-50 (1999)).

"Thus, the <u>Daubert</u> factors do not necessarily apply even in every instance in which reliability of scientific testimony is challenged, and in many cases, the reliability inquiry may instead focus upon personal knowledge and experience of the expert." <u>Davis</u>, 937 F. Supp. 2d at 412 (citation and internal quotation marks omitted).

Whether based on traditional science or specialized experience, Rule 702 further

mandates that an expert "stay within the reasonable confines of [their] subject area, and [thus] cannot render expert opinion on an entirely different field or discipline." Lappe v. Am. Honda Motor Co., Inc., 857 F. Supp. 222, 227 (N.D.N.Y. 1994), aff'd sub nom., Lappe v. Honda Motor Co. Ltd. of Japan, 101 F.3d 682 (2d Cir. 1996).

In other words, "where an expert is admitted under Rule 702 and then purports to offer opinions beyond the scope of their expertise, courts strike the extraneous testimony, as the admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case." Davis, 937 F. Supp. 2d at 413.

As always, "[t]he proponent of the expert testimony bears the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." Valente, 931 F. Supp. 2d at 415 (citation and internal quotation marks omitted). Importantly, however, "[t]he Second Circuit has held that under the Federal Rules of Evidence, there is a general presumption of admissibility of evidence." Hilaire v. DeWalt Indus. Tool Co., 54 F. Supp. 3d 223, 235 (E.D.N.Y. 2014) (citation and internal quotation marks omitted).

In other words, "the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee's note. Thus, "[t]o the extent that a party questions the weight of the evidence upon which the other party's expert relied or the conclusions generated from the expert's assessment of that evidence, it may present those challenges through cross-examination of the expert." R.F.M.A.S., Inc. v. So, 748 F. Supp. 2d 244, 252 (S.D.N.Y. 2010).

Ultimately, "a trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are "so unrealistic and contradictory as to suggest

bad faith" or to be in essence "an apples and oranges comparison." <u>Zerega Ave. Realty</u>

<u>Corp. v. Hornbeck Offshore Transp., LLC</u>, 571 F.3d 206, 213-14 (2d Cir. 2009); <u>see also</u>

<u>Davis</u>, 937 F. Supp. 2d at 412 ("Expert testimony must also be relevant under Rule 401 and

must not be unfairly prejudicial under Rule 403.").

Simply put, "our adversary system provides the necessary tools for challenging

reliable, albeit debatable, expert testimony." <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303

F.3d 256, 267 (2d Cir. 2002).

## IV. <u>DISCUSSION</u>

As an initial matter, the prior opinions issued in this case provide some much-needed

guidance on the scope of evidence relevant to Walker's claim. To review, the Second Circuit

concluded plaintiff pleaded a viable Eighth Amendment conditions-of-confinement claim

based on his allegations that:

> for approximately twenty-eight months, he was confined in a cell with
> five other men, with inadequate space and ventilation, stifling heat
> in the summer and freezing cold in the winter, unsanitary conditions,
> including urine and feces splattered on the floor, insufficient cleaning
> supplies, a mattress too narrow for him to lie on flat, and noisy,
> crowded conditions that made sleep difficult and place him at
> constant risk of violence and serious harm from cellmates.

<u>Walker</u>, 717 F.3d at 126.

In the Second Circuit's view, these factual allegations were sufficient to state an

Eighth Amendment claim for four principal reasons. As the panel explained:

> First, it is well settled that exposing prisoners to extreme
> temperatures without adequate ventilation may violate the Eighth
> Amendment . . . . Second, sleep is critical to human existence, and
> conditions that prevent sleep have been held to violate the Eighth
> Amendment . . . . Third, we have long recognize that unsanitary
> conditions in a prison cell can, in egregious circumstances, rise to
> the level of cruel and unusual punishment . . . . Indeed, unsanitary

- 12 -

conditions lasting for mere days may constitute and Eighth Amendment violation . . . . Further, the failure to provide prisoners with toiletries and other hygienic materials may rise to the level of a constitutional violation . . . . Fourth, conditions that place a prisoner at a 'substantial risk of serious harm' from other inmates may constitute cruel and unusual punishment.

Walker, 717 F.3d at 127-28 (cleaned up).

For the most part, these allegations were later substantiated as testimonial evidence by Walker in opposition to defendants' motion for summary judgment. Walker, 2016 WL 4203536, at *1-*5. As a result, Judge Kahn held that:

if Plaintiff proves all of the facts he alleges, he would prove multiple deprivations of the sort of necessities recognized by higher courts. [ ] Plaintiff has alleged a lack of adequate sanitation, physical injuries, inmate–inmate violence, severe sleep deprivation, combined with undisputed facts concerning overcrowding, cell temperatures, and ventilation that, taken as a whole, are sufficient to succeed on an Eighth Amendment claim.

Id. at *13.

*In other words, this trial is going to be about whether one or more of the defendants knew of and disregarded a condition or combination of conditions in Cell 127 that posed a substantial risk to Walker's health or safety. The evidence helpful to a fact finder tasked with making this determination is going to concern the conditions in Cell 127 between November 2008, when plaintiff arrived at FCI Ray Brook, and April 2011, when plaintiff left the facility.*

Evidence about the time(s) Walker spent in (and out) of Cell 127 each day will be relevant to evaluating the seriousness of the alleged condition(s), which in combination with the duration of plaintiff's exposure to them may also prove relevant to the related issue of defendants' knowledge, or lack of knowledge, about the risk to plaintiff's health or safety.

But the extended presentation of evidence about other amenities that may or may not

have been available to Walker *outside* Cell 127 is not relevant.  To the contrary, permitting

the admission of evidence about conditions that existed elsewhere in the prison is likely to

confuse the issues and mislead the jury.[5]  So while some minimal amount of background

about the prison complex may prove necessary to understand the general nature of the

claim, the Court will exercise its considerable authority to sharply limit the scope of evidence

in this case to the relevant issues:  the conditions of plaintiff's confinement in Cell 127, the

defendants' knowledge of those conditions, and what steps, if any, defendants took to

remedy those conditions.

With that basic framework firmly in mind, the Court turns to the parties' various

motions.

### 1.  Plaintiff's Motions in Limine

Walker has moved *in limine* to exclude:  (1) documents not produced in discovery;

(2) evidence or arguments about areas outside of Cell 127; (3) evidence of grievances he

filed at other prisons; (4) the details of his criminal convictions; (5) any argument that he

should have sued the BOP; (6) evidence of defendants' financial status; and (7) evidence

about FCI Ray Brook's history as an Olympic dormitory.  Dkt No. 194 & Exs. D-H.

### 1.  Documents Not Produced in Discovery

Walker contends defendants should be precluded from using at trial certain

documents withheld during discovery.  According to plaintiff, these documents

include:  (a) D-14, a "Diagram of Cell 127"; (b) D-58 and D-59, diagrams of Mohawk Unit B

and FCI Ray Brook; (c) grievances plaintiff filed at other prisons; and (d) D-66, a "Medical

---

[5]  Defendants misread Judge Kahn's reference to the "totality of the circumstances" as an invitation to introduce reams of evidence about every conceivable aspect of prison life.

Leave authorization" form for Counselor Sepanek.

### a. **Diagram of Cell 127**

Walker contends defendants did not produce D-14, a diagram of Cell 127, until the eve of the trial initially scheduled to begin in late September of 2017. Dkt. Nos. 186, 187. Plaintiff argues the diagram is prejudicial because it does not accurately reflect the shape, dimensions, or condition of the cell. According to plaintiff, this is not an actual illustration of Cell 127 in particular but rather a more general illustration of a six-man cell.

Defendants respond that a diagram of Cell 127, "or a sufficiently similar diagram," was produced during discovery and is listed as P-33 on least one of Walker's own previous exhibit lists. Defendants offer to redact the numbers on the diagram to avoid confusion, but argue that plaintiff's own diagram (P-33) is deficient in the same respects as D-14: it lacks furniture, fixtures, and a precise trapezoidal shape, too.

Upon review, this motion will be denied. To the extent that P-33 and/or D-14 amount to demonstrative exhibits of Cell 127 in particular, they may be used at trial, but only if the proponent seeking their use properly elicits testimony or introduces other evidence that they actually help to explain. See generally Verizon Directories Corp. v. Yellow Book USA, Inc., 331 F. Supp. 2d 136, 139 (E.D.N.Y. 2004) (Weinstein, J.) (discussing categories of pedagogical devices commonly used as demonstrative exhibits at trial).

### b. **Other Diagrams**

Walker contends defendants' diagrams of Mohawk Unit B (D-58) and FCI Ray Brook (D-59) should be excluded for substantially the same reasons. According to plaintiff, defendants seek to use these diagrams "generally at trial, even though neither of these documents was produced during discovery." Defendants respond in substantially the same

manner as they did with respect to D-14; that is, they argue that these are proper representations of both the housing unit and the facility and would therefore be beneficial to the jury.  Upon review, this motion will be granted.  These diagrams will be excluded.

### c. **Plaintiff's Grievances**

Walker contends the exhibit list disclosed by defendants in advance of the September 2017 trial contained new, previously unknown grievances filed at other facilities. Defendants respond that they anticipate using these grievances only for impeachment or rebuttal purposes in the event plaintiff  attempts "to introduce evidence or testify that he has never complained about similar conditions in other prisons, or that such conditions exist nowhere by FCI Ray Brook."

Upon review, this motion will be granted.  The only grievances that will be permitted at trial will be those that concern Cell 127 during the relevant time period.

### d. **Medical Leave Form**

Walker contends the BOP refused to produce information from defendants' personnel files out of concern for "institutional security," such as the medical leave authorization form for Counselor Sepanek listed as exhibit D-66.  Defendants respond that they do not intend to offer this document into evidence.  Instead, defendants disclosed D-66 in case it is necessary to refresh Counselor Sepanek's recollection.

Upon review, this motion is denied.  Defendants may use D-66, if necessary, for the limited purpose of refreshing Counselor Sepanek's memory.

### 2. **Areas Outside of Cell 127**

Walker contends defendants should not be permitted to introduce evidence about the prison complex that goes into areas outside of Cell 127.  Plaintiff argues defendants may try

to introduce this evidence "to paint a rosy picture of the prison or otherwise imply that conditions outside the cell somehow compensated for the extremely overcrowded conditions inside the cell." According to plaintiff, "[t]he grounds, facilities, and common areas did not, and could not, mitigate the overcrowded and inhumane conditions" he endured in Cell 127.

Defendants respond that Cell 127 "is not the only location that must be considered in this litigation, particularly as Plaintiff was not confined to his cell 24 hours a day, seven days a week. Rather, apart from the overnight sleeping hours, required daily counts, and the rare security lockdowns, Plaintiff was not required to stay within Cell 127 at all."

Upon review, this motion is granted consistent with the explanation set forth above. The trial remains limited to the conditions in Cell 127 during the relevant time period.

### 3. **Grievances Filed Elsewhere**

Walker contends that evidence of grievances he filed at other prison facilities should be precluded as irrelevant and unfairly prejudicial. Plaintiff argues that the only grievances that relevant in this case are the ones he filed at FCI Ray Brook to complain about conditions in Cell 127.

Defendants respond that the grievances filed by Walker at other federal institutions, both before and after his stay at FCI Ray Brook, tend to "corroborate Defendants' evidence that the conditions of Plaintiff's confinement met [BOP] guidelines, demonstrate Plaintiff's knowledge that Cell 127's conditions were adequate under [BOP] policy, and demonstrate Plaintiff's ulterior motivation in bringing those grievances and this lawsuit."

As defendants explain, Walker and his expert witnesses are likely to testify that the conditions in Cell 127 were "materially worse" than those found elsewhere in the federal prison system. Defendants assert that these grievances will show that plaintiff repeatedly

complained about the same issues (e.g., bed size, ventilation, and the efficacy of cleaning products provided by prison officials) regardless of whether he was confined at FCI Ray Brook or at any other facility in the federal system.

As a general matter, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1) (emphasis added).

And as Walker points out, "[l]itigiousness is the sort of character trait with which Rule 404(b) is concerned." Outley v. City of N.Y., 837 F.2d 587, 592 (2d Cir. 1988) ("[A] plaintiff's litigiousness may have some slight probative value, but that value is outweighed by the substantial danger of jury bias against the chronic litigant.").

However, the Federal Rules of Evidence acknowledge that "[t]his evidence may be admissible for another purpose." FED. R. EVID. 404(b)(2). In the Second Circuit, all "other act" evidence is admissible provided that it "does not serve the sole purpose of showing the [party's] bad character and that [it] is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." United States v. Curley, 639 F.3d 50, 56 (2d Cir. 2011) (analyzing admission of prior bad act for non-propensity purpose in criminal prosecution).

Against this general backdrop, defendants argue that some courts have held evidence of a plaintiff's litigiousness might be permissible "if the previous claims made by the party are shown to have been fraudulent." Young v. Calhoun, 1995 WL 169020, at *6 (S.D.N.Y. Apr. 10, 1995).

For instance, admission of a plaintiff's prior lawsuits might be allowed if those prior proceedings "were similar enough to the action before the court that they could reveal that the plaintiff had a motive, plan or scheme to bring similar kinds of claims against those who

crossed him." <u>Hickey v. Myers</u>, 2013 WL 2418252, at *4 (N.D.N.Y. June 3, 2013)

(D'Agostino, J.) (citing <u>Van Deelen v. Johnson</u>, 2008 WL 4683022, at *3 (D. Kan. Oct. 22,

2008)).

Defendants argue Walker's grievances demonstrate such a pattern of fraudulent

activity, and suggest that defendant may have used the inmate grievance process to attempt

to secure preferential treatment at various federal facilities.  However, the obvious problem

with this line of reasoning is that it would require defendants to show that these other

grievances were fraudulent or otherwise representative of a pattern of fraudulent activity.

It would not be enough to show that the grievances filed by Walker at other facilities

did not lead to relief from prison officials, since the mere denial of a grievance does not *ipso*

*facto* render it problematic—plaintiff might well have been appropriately complaining about

unconstitutional conditions elsewhere.[6]  <u>Upon review, this motion is granted and this</u>

<u>evidence is excluded.</u>

### 4.  <u>Prior Convictions</u>

Walker contends evidence regarding his prior criminal convictions should be excluded

as irrelevant and prejudicial.  As plaintiff explains, the 1999 conviction that led to his

confinement at FCI Ray Brook involved, inter alia, a conspiracy to distribute a significant

amount of cocaine.  <u>United States v. Thompson</u>, 286 F.3d 950 (7th Cir. 2002) (describing

Walker's criminal conduct and prosecution).  Plaintiff states that he also served time from

1993 to 1997 after he pleaded guilty in Indiana to a narcotics crime.

"Federal Rule of Evidence 609 controls the impeachment of a witness by evidence of

---

[6]  To the extent that system-wide conditions might go to a qualified immunity issue, there are other
ways to introduce that evidence.

a criminal conviction." <u>United States v. White</u>, 312 F. Supp. 3d 355, 358 (E.D.N.Y. 2018). In a civil matter, the general rule is that evidence of "a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year . . . must be admitted, subject to Rule 403[.]" FED. R. EVID. 609(a)(1)(A).

As the Second Circuit has explained, "[t]he Rule requires district courts to admit the name of a conviction, its date, and the sentence imposed unless the district court determines that the probative value of that evidence 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" <u>United States v. Estrada</u>, 430 F.3d 606, 620-21 (2d Cir. 2005) (quoting FED. R. EVID. 403).

"In balancing the probative value against the prejudicial effect under this rule, courts examine the following factors:  (1) the impeachment value of the prior crime, (2) the remoteness of the prior conviction, (3) the similarity between the past crime and the conduct at issue, and (4) the importance of the credibility of the witness." <u>Espinosa v. McCabe</u>, 2014 WL 988832, at *2 (N.D.N.Y. Mar. 12, 2014) (D'Agostino, J.) (quoting <u>Daniels v. Loizzo</u>, 986 F. Supp. 245, 250 (S.D.N.Y. 1997)).

However, there is a time limitation on the admissibility of this kind of impeachment evidence. FED. R. EVID. 609(b). "Criminal convictions more than ten years old are not admissible for impeachment unless the court determines that, in the interest of justice, the probative value of the conviction substantially outweighs its prejudicial effect." <u>Espinosa</u>, 2014 WL 988832, at *2 (citation omitted). "Under Rule 609(b), convictions over [ten] years old should be admitted very rarely and only in exceptional circumstances, as convictions over ten years old generally do not have much probative value." <u>Id</u>. (citation and internal

quotation marks omitted).

Walker argues jurors will know he was convicted of a criminal offense by virtue of the fact that he was in FCI Ray Brook in the first place, and asserts that defendants can effectively impeach him by referencing the fact of his imprisonment. However, plaintiff argues that "[a]ny further description of the nature of the offense, or the length of [plaintiff's] prison sentence, would risk biasing the jurors." Defendants respond that they do not object to this motion and "will not introduce any such evidence in their case in chief." However, defendants assert the right to introduce this evidence in rebuttal.

The criminal conviction that landed Walker in FCI Ray Brook does not appear to implicate the ten-year limitation, since it runs from the *later* of the witness's conviction or release from confinement. FED. R. EVID. 609(b)(1). However, there is little or no probative value to the sordid details of the drug conspiracy in which Walker was involved, and in any event that value would be substantially outweighed by the prejudicial effect this kind of evidence would have. And the Indiana conviction is so stale as to be irrelevant.

Upon review, this motion is granted. It is enough for the fact finder to know that plaintiff spent time incarcerated at FCI Ray Brook on the basis of a felony conviction.

### 5. **The BOP**

Walker contends defendants should not be permitted to argue to the jury that plaintiff should have sued the BOP rather than the individual defendants. According to plaintiff, defendants "will likely lay the blame for [plaintiff's] overcrowded cell and other poor prison conditions at the feet of the BOP and argue that [he] should have sued the BOP and not the individual Defendants."

Defendants respond by agreeing not to make "any such representations to the

jury."  However, defendants argue that this motion should be denied "to the extent necessary to permit Defendants to present evidence and argument regarding the nature of the individual-capacity claims against them, and to make clear to the jury that the claims before them are against the individual defendants, not the United States or the Bureau of Prisons."

Lurking in the background of this argument is an issue that, despite all the motion practice in this case, has apparently never been definitively resolved.  As a general matter, "<u>Bivens</u> actions are for damages. They cannot be viewed as actions against the government."  <u>Simpkins v. D.C. Gov't</u>, 108 F.3d 366, 369 (D.C. Cir. 1997).  However, Walker insists that he named defendants in their individual *and* official capacities and therefore he *also* properly sued the United States.  Defendants insist that it no longer matters—although any claim against the United States would be tried to the Court, not a jury, the only viable claim would be for injunctive relief, which has almost certainly been mooted by plaintiff's release from custody.

<u>Upon review, this motion will be granted and defendants will be precluded from arguing to the jury that Walker improperly sued the individual defendants and/or should have sued the BOP.</u>

**6.  Defendants' Financial Status**

Walker contends defendants should be barred from presenting evidence at trial about defendants' financial status or ability to satisfy a judgment.  Defendants do not object to this motion, but point out they may introduce this evidence in rebuttal if Walker places defendants' "personal finances, wealth, or ability to pay damages at issue in any way."

<u>Upon review, this motion is granted.  Defendants will be precluded from presenting evidence about defendants' financial status or ability to satisfy a judgment.</u>

### 7. <u>FCI Ray Brook's History</u>

Walker contends defendants should not be permitted to reference the fact that FCI Ray Brook housed athletes during the 1980 Winter Olympics. Defendants respond that evidence about FCI Ray Brook's layout and history will aid the jury in evaluating the "totality of the circumstances."

By way of background, in 1976 "the International Olympic Committee [ ] officially designated Lake Placid as the site of the 1980 Winter Olympics." <u>Stop the Olympic Prison v. U.S. Olympic Comm.</u>, 489 F. Supp. 1112, 1115 (S.D.N.Y. 1980). "Congress authorized $49 million in federal funds for the construction of facilities for the Games," but in "a laudable bit of legislative foresight," conditioned the appropriation on the requirement "that any facilities built for the Olympics be subsequently put to some permanent use." <u>Id</u>.

The organizing committee considered and rejected various alternatives before it settled on constructing a prison. <u>Stop the Olympic Prison</u>, 489 F. Supp. at 1115. The BOP approved of the idea and "asked Congress to authorize funds for a medium security facility for young offenders." <u>Id</u>. Thereafter, "Congress gave its approval, the State of New York donated 155 acres of woodland in Ray Brook, about five miles from Lake Placid, and design and construction [ ] began." <u>Id</u>.

But the Olympic athletes were long gone by the time Walker arrived at FCI Ray Brook in November 2008. In fact, plaintiff points out that no Olympic athlete ever enjoyed the privilege of spending any time in what would later become Cell 127, since it did not exist yet. Instead of being part of the architect's original blueprints, Cell 127 owes its existence to the endless ingenuity of some enterprising prison officials who came on the scene later—the six-man cell plaintiff occupied was created when prison officials knocked down a wall

separating a pair of two-man cells.

Whatever conditions might have been like in the facility in 1980, they do not shed any light on the conditions in the facility during the relevant time period. What other changes, besides creative cell "upgrades" like those made to Cell 127, were made to the facility when Olympic officials turned the keys over to the BOP?

After all, does the fact that this facility once housed Olympic athletes mean that it is somehow better constructed than other facilities? Or was this facility constructed in the usual manner as other federal prisons and simply forced upon the unlucky Olympic competitors who represented their countries at Lake Placid that year?[7]

Indeed, accepting defendants' argument on this point runs counter to claims they have made elsewhere. If conditions across prisons at the BOP are completely standardized, as defendants insist, then are defendants asking the Court to believe that all BOP facilities would meet the expectations of Olympic athletes? Or just 1980s-era Olympic athletes?

Upon review, this motion is granted. FCI Ray Brook's history is irrelevant and would not help the jury better understand Walker's claims about the conditions he allegedly endured at the facility thirty years later. Defendants are precluded from offering this kind of evidence at trial.

### B. Defendants' Motions in Limine

Defendants have moved *in limine* to exclude: (1) evidence or argument about the acts or omissions of non-party federal employees; (2) details of lawsuits filed by other inmates

---

[7] Contemporaneous accounts suggest it was more likely the latter. See, e.g., William Oscar Johnson, The Olympic Getaway, SPORTS ILLUSTRATED, April 9, 1979, at 19-22 (quoting delegation spokesmen who toured the facility describing it as "lousy," "rotten," "the worst [ ] ever seen," "[s]hocking" and reporting that various national federations sought to rent alternative accommodations for their athletes at significant cost), available at https://www.si.com/vault/issue/70825/toc (last visited March 7, 2019).

alleging harm from the conditions at FCI Ray Brook; (3) limit consideration of certain hearsay statements; (4) evidence or argument about the possibility of indemnification; and (5) evidence or argument about the "abstract value" of Walker's rights.  Dkt. No. 191.

### 1. **Acts or Omissions of Non-Parties**

Defendants' first motion actually includes a laundry list of demands, but in essence it advances various reasons why Walker should not be permitted to introduce evidence about the conduct of various non-party prison officials.  Plaintiff responds by reminding defendants that he sued them in their *official* capacities.  Even putting that issue aside, however, plaintiff emphasizes that he is only attempting to hold defendants liable for their *own* actions or omissions.

Walker insists that he must introduce evidence at least some evidence about the BOP and about the actions of non-party prison employees—defendants were supervisory officials responsible for ensuring FCI Ray Brook's compliance with prison accreditation standards, and reports they received from subordinates (i.e., non-party prison employees) about the conditions in Cell 127 (and elsewhere in the facility) are "squarely at issue" in this case.  Plaintiff asserts he will also introduce evidence establishing defendants' broad-ranging exercise of supervision and control over the conditions in Cell 127.

To be sure, a Bivens action is not "a proper vehicle for altering an entity's policy." Ziglar v. Abbasi, 137 S. Ct. 1843, 1870 (2017) (citation omitted).  And unlike state tort law, constitutional torts cannot be premised on a theory of *respondeat superior*.  Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

But defendants' request to preclude broad areas of evidence from the trial does not necessarily follow from these rather straightforward propositions.  While the implied cause of action recognized in Bivens does not extend to every single constitutional challenge that might be brought against a state official under § 1983, the Supreme Court has recognized the viability of a Bivens-type action in the context of an Eighth Amendment claim for deliberate indifference to the mistreatment of a prisoner.  Carlson v. Green, 446 U.S. 14 (1980); see also Ziglar, 137 S. Ct. at1864 (declining to extend Carlson to permit Bivens cause of action against supervisory prison official predicated on alleged violation of Fifth Amendment rights of pre-trial detainees).

Where, as here, Bivens does apply, "the implied cause of action is the federal analog to suits brought against state officials under [§ 1983]." Iqbal, 556 U.S. at 675 (citation and internal quotation marks omitted).  As the Supreme Court has recognized, "[i]n a § 1983 suit or a Bivens action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer." Id. at 677;

Instead, a supervisor's "personal involvement" has been found where he or she:  "(1) participated directly in the alleged constitutional violation; (2) failed to remedy the wrong after being informed of the violation through a report or appeal; (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring." Vazquez-Mentado v. Buitron, 995 F. Supp. 2d 93, 96 (N.D.N.Y. 2014) (Kahn, J.) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d

Cir.1995) (applying <u>Colon</u> factors to a <u>Bivens</u> claim).[8]

Walker's Eighth Amendment claims require him to demonstrate that one or more defendant knew of and disregarded one or more conditions that posed a serious threat to his health or safety. Plaintiff argues that his evidence will show that defendants, some of whom are or were supervisory officials at FCI Ray Brook, learned about the conditions in Cell 127 but chose to disregard them.

Among other things, if Walker can show that defendants were responsible for concealing certain information about the state of plaintiff's cell from the accrediting agency in connection with an audit, it would tend to show an awareness that those living conditions failed to meet even the ACA's minimally-acceptable standards.

<u>Upon review, defendants' motion is denied. However, the Court will take appropriate steps to limit the presentation of this kind of evidence in the event it becomes cumulative or otherwise improper.</u>

## 2. <u>Lawsuits Filed by Other Inmates</u>

Defendants contend Walker should not be permitted to introduce evidence of lawsuits filed by other inmates who were confined at FCI Ray Brook during the same time period as plaintiff. Plaintiff responds that he plans to introduce them to demonstrate that defendants were on notice of the overcrowded, unsafe conditions in the six-man cells at FCI Ray Brook.

Further, Walker emphasizes that at least one inmate complaint attaches memoranda authored by two of the named defendants about "lockdowns" at FCI Ray Brook. As plaintiff

---

[8] There is some doubt within the Circuit about the continuing vitality of this supervisory liability test. <u>Reynold v. Barrett</u>, 685 F.3d 193, 205 n.14 (2d Cir. 2012). In fact, the dissent in <u>Iqbal</u> suggested supervisory liability against federal officials might have been eliminated *sub silentio*. *Iqbal*, 556 U.S. at 693 (Souter, J., dissenting) ("Lest there be any mistake, in these words the majority is not narrowing the scope of supervisory liability; it is eliminating <u>Bivens</u> supervisory liability entirely.").

explains, "during lockdown periods, inmates were confined to their cells for the entire day, sometimes for days on end."  According to plaintiff, these memoranda are admissions by a party-opponent as to those two defendants.

Notably, as Walker points out, state of mind is relevant to the issue of whether one or more defendants violated his Eighth Amendment rights.  <u>Chance v. Armstrong</u>, 143 F.3d 698, 702 (2d Cir. 1998) ("[D]efendant must act with a sufficiently culpable state of mind.").

And as the Second Circuit previously explained in this case, "[e]vidence that a risk was obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk."  <u>Walker</u>, 717 F.3d at 125 (citation and internal quotation marks omitted).

<u>Upon review, this motion will be denied in part.  As with every other ruling, Walker will be limited to introducing evidence that bears on the conditions in Cell 127.</u>

### 3. **Grievances**

Defendants contend Walker should not be permitted to use the grievance forms he filed at FCI Ray Brook for the purpose of proving the truth of his allegations regarding his cell conditions because it would violate the rule against hearsay.  Plaintiff responds that he has no intention of offering the grievance forms for the truth of their contents.  Instead, plaintiff plans to offer them to establish defendants' knowledge, state of mind, and deliberate indifference to the cell conditions.

<u>Upon review, this motion will be denied in part.  Walker remains limited to introducing evidence that bears on the conditions of his confinement in Cell 127.</u>

### 4. **Indemnification**

Defendants contend Walker should be precluded from introducing evidence or

argument that suggests defendants may be indemnified by the BOP or that the United States will satisfy any judgment.  Although defendants acknowledge that the relevant federal regulatory regime permits discretionary indemnification, 28 C.F.R. § 50.15(c), (a)(8)(iii), they also point out that it is sometimes actually denied.  Cf. Turner v. Shultz, 187 F. Supp. 2d 1288, 1297 (D. Colo. 2002) (finding non-justiciable the Department of Justice's denial of indemnification of certain BOP employees).  Plaintiff responds that he does not oppose this request.

"If the Bivens defendant is found liable, he becomes personally responsible for satisfying the judgment, although in some instances the government may indemnify him." Simpkins, 108 F.3d at 369.  Accordingly, "[i]n the general case courts exclude evidence of indemnification out of a fear that it will encourage a jury to inflate its damages award because it knows the government—not the individual defendants—is footing the bill." Lawson v. Trowbridge, 153 F.3d 368, 379 (7th Cir. 1998).

However, the rule is subject to exceptions, and evidence about indemnification might be permitted if defendants introduce certain evidence at trial.  See, e.g., Lawson, 153 F.3d at 379 (holding trial court should have permitted plaintiff to point out state's discretionary indemnification statute after state defendants "opened the door" by testifying about their "financial weakness").

Upon review, defendants' motion will be granted.  Walker is precluded from introducing evidence or argument that suggests defendants may be indemnified or that the BOP or the United States will ultimately satisfy any judgment.

### 5. Abstract Value of Constitutional Rights

Defendants contend Walker should not be permitted to argue that the alleged violation

of his Eighth Amendment rights "caused unspecified damages to his human dignity or person, the importance of which must be recognized by a large compensatory award." Plaintiff responds that he plans to introduce evidence of "actual injuries he suffered, including aggravated chronic pain, discomfort, chronic sleep deprivation, pain and suffering, and emotional and mental distress."

The Supreme Court has made clear that a damages award cannot be based on "the jury's subjective perception of the importance of constitutional rights as an abstract matter." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 308 (1986). Thus, a plaintiff who manages to establish a violation of his constitutional rights but fails to introduce proof of actual injury is entitled only to an award of nominal damages. Id.; Miner v. City of Glens Falls, 999 F.2d 655, 660 (2d Cir. 1993) ("Absent a showing of causation and actual injury, a plaintiff is entitled only to nominal damages.").

However, this language should not be understood to preclude recovery for damages that are supported by competent evidence yet "difficult to precisely quantify," such as "damages for emotional distress, mental anguish, and mental pain and suffering." Ruhlmann v. Smith, 323 F. Supp. 2d 356, 367 (N.D.N.Y. 2004) (characterizing "such concepts [as] abstract and ill-suited to exacting calculation"); see also Earley v. Annucci, 2018 WL 5993683, at *5 (N.D.N.Y. Nov. 15, 2018) ("One type of damages is associated with proof of pain, physical injury, mental suffering, humiliation, psychological deterioration, and associated medical expense."). In other words, "the rule which proscribes the recovery of uncertain and speculative damages applies where the fact of damages is uncertain, not where the amount is uncertain." Wallace v. Suffolk Cty. Police Dep't, 809 F. Supp. 2d 73, 81

(E.D.N.Y. 2011).[9]

Upon review, this motion will be granted.  Walker is restricted to introducing evidence of actual injuries, physical or mental, that he suffered.

### C. __Motion to Preclude Dr. Gilligan__

Defendants have moved to preclude the testimony of James F. Gilligan, M.D., one of plaintiff's experts.  Dkt. No. 193.  According to defendants, Dr. Gilligan's opinions "consist of reiterating and exaggerating Plaintiff's allegations from the complaint" and therefore his proposed testimony "does nothing to properly prove any essential element of Plaintiff's claim."

Walker responds that defendants have mischaracterized Dr. Gilligan's opinions and argue that there is nothing objectionable about a qualified witness providing a medical opinion about whether or not a plaintiff's allegations, if true, would constitute a particular kind of psychological harm or how those facts, if true, would cause short- and long-term physical and psychological effects.  According to plaintiff, defendants' complaints about the shortcomings of Dr. Gilligan's proposed testimony are best remedied by effective cross-examination.

Dr. Gilligan is licensed as a medical doctor and psychiatrist who specializes in correctional health care.  He has extensive experience in clinical, administrative, teaching,

---

[9] "Damages in a section 1983 case are generally determined according to principles derived from the common law of torts."  Wallace, 809 F. Supp. 2d at 81.  This is a background issue worth noting because both parties to cite to Kerman v. City of N.Y., 374 F.3d 93 (2d Cir. 2004), as part of their damages discussion.  As relevant here, the split panel in Kerman threaded the needle, drawing a distinction between the sort of abstract damages condemned by the Supreme Court in Stachura and the continuing permissibility of "presumed damages," which were recognized at common law to compensate for a "loss of liberty" or other intangible, even in the absence of other compensable injury.  374 F.3d at ; see also Earley, 2018 WL 5993683, at *5 (treating a plaintiff's loss of liberty as a "second and distinct category of actual damage")

and research positions at universities, teaching hospitals, and in prisons and jails.  Notably, Dr. Gilligan served as the Clinical Director of mental health services for the Commonwealth of Massachusetts's entire prison system from 1977 to 1992.

As Walker explains, Dr. Gilligan's proposed testimony includes three "core" expert opinions:  "(1) the conditions alleged by Plaintiff amount to psychological torture under prevailing medical and psychiatric standards, (2) there are medically-proven mental and physical effects that result from psychological torture, and (3) there is a compounding effect that the infliction of multiple forms of torture can have on one person."

Defendants first argue Dr. Gilligan's testimony should be excluded because he "had no independent knowledge of Plaintiff's cell conditions and instead relied on allegations from the Complaint."  According to defendants, Dr. Gilligan improperly "assumes the accuracy" of plaintiff's allegations and therefore "has no idea what actually occurred in Cell 127 at FCI Ray Brook."

This argument is rejected.  "Of course, courts do not simply take the word of people with experience[.]"  Veleron Holding, B.V. v. Morgan Stanley, 117 F. Supp. 3d 404, 443 (S.D.N.Y. 2015).  And "[c]onclusory allegations of an expert absent a statement of the facts upon which they are based, are as insignificant as the conclusory allegations of a party, his attorney, or any other witness."  Prohaska v. Sofamor, S.N.C., 138 F. Supp. 2d 422, 437 (W.D.N.Y. 2001) (citation and internal quotation marks omitted).

However, "[i]t has long been accepted that an expert witness may voice an opinion based on facts concerning the events at issue in a particular case even if the expert lacks first-hand knowledge of those facts."  Williams v. Illinois, 567 U.S. 50, 67 (2012) (plurality opinion) (rejecting Confrontation Clause challenge where expert based opinion on facts to

which he was not competent to testify).

Dr. Gilligan's expert report indicates that he reviewed certain documents that were provided to him by Walker's counsel, including the complaint that plaintiff initially filed pro se. Robinson v. Suffolk Cty. Police Dep't, 2011 WL 4916709, at *3 (E.D.N.Y. Oct. 17, 2011) (faulting expert for not reviewing, inter alia, the pleadings in the suit), aff'd, 544 F. App'x 29 (2d Cir. 2013) (summary order). In addition, Dr. Gilligan reviewed various accreditation reports for FCI Ray Brook, yearly population level reports for the prison during the relevant time period, a deposition of one of the defendants to this action, and the expert report of Martin F. Horn, another of plaintiff's experts.

In other words, Dr. Gilligan's testimony is unlike the experts whose opinions were excluded in the two cases identified by defendants. LaBarge v. Joslyn Clark Controls, Inc., 2006 WL 2795612, at *6 (W.D.N.Y. Sept. 26, 2006) (excluding expert on causation who conducted zero examination, observation, or testing of the machine involved in the accident), aff'd, 242 F. App'x 780 (2d Cir. 2007) (summary order); Supply & Bldg. Co. v. Estee Lauder Int'l, Inc., 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001) (excluding expert who testified that his opinion was based *solely* on his client's claims and that he did not review any other relevant materials that were available to him).

Applying expert knowledge to a given set of facts is precisely the sort of thing experts are expected to do. In this case, Dr. Gilligan appears to have reasonably applied his expertise as a doctor and psychiatrist intimately familiar with the psychological effects of a prison setting to Walker's specific claims about his experience in Cell 127. Certainly defendants do not think that Dr. Gilligan was obligated to spend time in a cell under the conditions alleged by plaintiff before he could permissibly opine as to the likely psychological

effects of those conditions.

Some or all of Walker's claims about the conditions in Cell 127 might be exaggerated or untrue. But that is what we are going to hold a trial to try to figure out. To the extent that testimony, documents, or other evidence might tend to undermine plaintiff's version of events, defendants can and should examine Dr. Gilligan about how those changed circumstances would alter or otherwise undermine his expert opinion.

Defendants next argue that Dr. Gilligan improperly proposes to opine on whether Walker suffered cruel and unusual punishment at FCI Ray Brook. According to defendants, Dr. Gilligan essentially intends to "recite the facts of the case" and then offer a conclusion "about how the law should be applied to those facts."

Walker responds that this characterization of Dr. Gilligan's report is inaccurate. As plaintiff explains, Dr. Gilligan proposes to opine that the conditions alleged by plaintiff, if true, amount to psychological "torture" or "cruel, degrading and inhumane treatment" within the meaning of, and based upon, generally accepted medical and psychiatric standards.

Defendants argue that permitting Dr. Gilligan to use the word "torture" in his testimony will unfairly prejudice their defense because it will mislead the jury into believing this case is about torture, which defendants claim is a "well-known concept, easy for jurors to understand and condemn." According to defendants, the jury will fail to understand the "more complicated claim Plaintiff has actually brought for unlawful conditions of confinement."

This argument is also rejected. To be sure, the word "torture" is one freighted with strong emotion. But Dr. Gilligan's report indicates that "[c]onditions such as prolonged sleep deprivation, exposure to extreme temperatures and severe overcrowding have long been considered forms of torture within the international community of mental health

professionals," of which he is a part. In other words, this appears to be a medical opinion, not a legal one, and it is based on Dr. Gilligan's academic and professional expertise in the fields of psychology and medicine and his work experience in and around the prison setting.

In sum, after considering the parties' arguments and upon review of Dr. Gilligan's expert report in light of the governing standard, <u>defendants' motion to preclude his expert testimony will be denied. As with this and every other evidentiary issue, the Court will exercise its authority during trial to prevent superfluous, cumulative, or otherwise inappropriate testimony.</u>

### D. <u>Jury Visit</u>

Defendants request authorization for a jury visit of FCI Ray Brook, either in person or through use of recorded video. Dkt. No. 192. Defendants argue that the jury will better understand Walker's "overall living conditions" if they are treated to an in-person view of Cell 127, the adjacent common areas, the housing unit, and the prison complex. According to defendants, mere photographs of the cell "cannot adequately portray the 'space' in which Plaintiff was living."

Walker responds that this request should be denied because it would mislead the jury. As plaintiff explains, it is imperative that the jury be provided with an accurate description of the conditions in Cell 127 as they were at the time plaintiff lived there, not as they might be now, nearly a decade later. Plaintiff asserts that photographs reveal that defendants have already taken "significant steps" to alter the appearance of the cell, including thoroughly cleaning the cell, removing certain furniture, and even possibly repainting the walls. According to plaintiff, showing the jury a pristine, vacant cell would be unhelpful in resolving the issues in this case.

The Second Circuit has not said very much about how a trial court should evaluate a party's request for a jury visit. In a per curiam opinion handed down in 1953, the Second Circuit concluded the trial court had properly denied a visit where witness testimony and photographs adequately described the scene of the crime. United States v. Pagano, 207 F.2d 884, (2d Cir. 1953) (per curiam) (reviewing denial of jury visit for abuse of discretion).

Since Pagano, at least one district court in our Circuit confronted with the issue of whether to permit a jury visit has found guidance elsewhere. United States v. Praisner, 2010 WL 2574087, at *1 (D. Conn. June 10, 2010). In Praisner, the trial court evaluated several factors identified by the First Circuit in United States v. Crochiere, 129 F.3d 233, 236 (1st Cir. 1997), including: "(1) the orderliness of the trial; (2) whether the jury would be confused or misled; (3) whether it would be time-consuming or logistically difficult; and (4) whether cross-examination had been permitted regarding the details of the scene." Praisner, 2010 WL 2574087, at *1.

Defendants acknowledge that bussing the jury to Ray Brook would likely involve a full day, but argue that any logistical concerns would be "greatly outweighed by the benefit to the jury of seeing the prison first-hand," and would help "avoid any confusion that may arise with describing the facility with witness testimony."

Walker responds that a visit cannot replicate the the reality of "six men living in a single cell with the doors closed for hours on end." According to plaintiff, "the air quality, ventilation, and temperature in the cell will hardly be representative of the conditions" he endured. To the contrary, a pre-planned visit to a "staged cell" will have the opposite effect—it will permit defendants to present a "rosy version" of FCI Ray Brook.

Walker has the better of this argument, and it is not a close call. A jury visit would

impose significant logistical hurdles with little payoff and huge risks. First, the trip from Utica to Ray Brook is neither short nor direct. Second, this case poses security headaches above and beyond those already inherent in safeguarding a jury outside the confines of a federal courthouse.

Rather than visiting a discrete location in a public space, such as the scene of a particular crime, defendants seek a tour of FCI Ray Brook, a large prison complex that holds a population of federal inmates. As Walker points out, it is likely that prison officials would relocate inmates away from areas shown to the jurors. This would provide an inaccurate representation of those common spaces, since Walker did not have the prison to himself during the time period at issue in this case.

That fact, of course, leads into another reason a visit would be unwarranted, in-person or otherwise. The jury will see a version of Cell 127 that will look, feel, and smell nothing like Walker testified it did when he shared the space with five other men. Rather than enhance the jury's understanding of the issues, a visit to FCI Ray Brook now, in 2019, is likely to form in their minds an image of the facility that reflects testimony of only one side of the case: defendants' side. <u>Marquez v. Casa Espana en Puerto Rico</u>, 104 F. Supp. 3d 186, 189 (D.P.R. 2015) ("[A] jury view of the premises in a condition other than that of its condition at the time of the incident serves no purpose in describing or 'painting' a picture of the scene to assist the jury in determining what the truth is.").

<u>Upon review, defendants' motion for a jury visited will be denied because they have failed to demonstrate that witness testimony, photographs, diagrams, and other evidence will be insufficient.</u>

**E.  Judicial Notice**

Walker has moved the Court to take judicial notice of the:  (1) total unencumbered space in Cell 127; (2) relevant ("ACA") standards; (3) daily temperatures during plaintiff's confinement; and (4) "lockdowns" that took place during that time.  Dkt No. 201.

Under the Federal Rules of Evidence, a court may take judicial notice of a fact "that is not subject to reasonable dispute because it:  (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b).[10]  As relevant here, a court "must take judicial notice if a party requests it and the court is supplied with the necessary information."  FED. R. EVID. 201(c).

"In a civil case, once the court takes judicial notice of adjudicative facts . . . , 'there is to be no evidence before the jury in disproof,' and '[t]he judge instructs the jury to take judicially noticed facts as established.'"  Cabrera v. Schafer, 178 F. Supp. 3d 69, 72 (E.D.N.Y. 2016) (quoting Advisory Committee Note G to FED. R. EVID. 201).  Accordingly, "[b]ecause the effect of judicial notice is to deprive a part of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)."  Id.

First, Walker requests judicial notice that:  (1) the amount of unencumbered space in Cell 127 was 99.07 square feet and (2) the amount of unencumbered space per inmate in the cell was 16.51 square feet.  According to plaintiff, the parties have already stipulated to

---

[10]  More generally, the 'traditional textbook treatment' of Rule 201 has included two categories for judicial notice:  'matters of common knowledge' and 'facts capable of verification.'"  United States v. Bari, 599 F.3d 176, 180 (2d Cir. 2010) (citation omitted).

the measurements necessary to calculate these amounts. Defendants do not oppose the mathematical calculations but object to plaintiff's usage of "unencumbered" and explain that the "per inmate" description of the space is not entirely accurate. According to defendants, trial evidence will show that the cell did not always house six inmates.

Second, Walker requests judicial notice of the ACA standards that are relevant to this case. These include, among other things, the ACA's standards for how many inmates can be safely housed in a prison facility, the organization's definition of "unencumbered space," and its formula for making that calculation on a "per inmate" basis. Defendants oppose this request as an improper subject for judicial notice.

Third, Walker request judicial notice of the daily temperatures at FCI Ray Brook from November 18, 2008 to April 18, 2011 using weather records. Defendants object to this request as ambiguous and possibly irrelevant. As defendants point out, the temperature outside the facility is not *necessarily* relevant with how warm or cold the space inside the facility might be. However, they agree that it would be proper to take judicial notice of the "actual daily high and low temperatures" during that time period.

Fourth, Walker request judicial notice of certain "lockdown" periods that took place at FCI Ray Brook. Plaintiff argues these "lockdown" periods are documented in a decision of the Federal Labor Relations Authority ("FLRA") and a newspaper article. Defendants object because plaintiff's description of the FLRA's written decision is inaccurate. Further, defendants object to plaintiff's characterization of what these "lockdown" periods entailed.

Upon review, this motion is granted in part and denied in part. The Court will take judicial notice of the actual high and low temperatures in the Ray Brook area during the relevant time period. The Court will also take judicial notice of the fact of the ACA standards

that have been identified as relevant.  However, the burden remains on plaintiff to introduce testimony or other evidence connecting those standards to the facts of this case.  And evidence about the duration of, and conditions experienced during, the "lockdown" events at the prison are proper subjects for testimony or other evidence, not judicial notice.

### F.  Electronic Equipment and Demonstrative Evidence

Finally, the parties have jointly requested leave to bring electronic equipment and other demonstrative evidence into Court for use at trial.  Dkt. No. 208.  In particular, the parties request use of:  (1) up to four laptop computers for each party; (2) extension cords and surge protectors; (3) whatever cables and adapters are necessary; (4) one LCD screen for each party; (5) one blackberry, cell phone, or personal device for each individual identified in Exhibit A; and (6) certain demonstrative exhibits, including trial boards and blowups.

This motion is granted, except as to request #5.  Exhibit A to this joint request includes a list totaling thirty people.  It appears that some of the individuals listed are counsel of record.  However, others appear to be witnesses or non-parties.

Under current District policy, attorneys of record are generally permitted to retain personal devices when appearing in connection with a proceeding.  See N.D.N.Y. General Order #26.  All others are not.  Id.  The parties have identified no reason to depart from the general rule in this case.

Further, the parties are advised that current policy does not permit litigants to connect laptops or other devices to judiciary ethernet or WiFi.  Accordingly, the parties should plan to download in advance any materials they plan to use at trial.

## V.  CONCLUSION

Therefore, it is

ORDERED that

1. Defendants' motion in limine is GRANTED in part and DENIED in part;

2. Defendants' request for a jury visit is DENIED;

3. Defendants' motion to exclude Dr. Gilligan is DENIED;

4. Plaintiff's motion in limine is GRANTED in part and DENIED in part;

5. Plaintiff's request for judicial notice is GRANTED in part and DENIED in part:

6. The parties' joint request for leave to bring electronic equipment and demonstrative evidence is GRANTED in part and DENIED in part.

IT IS SO ORDERED.


Dated:  March 13, 2019
        Utica, New York.

United States District Judge